**In re Clovis NMN SIMPKINS, Freddie Carol Simpkins, Debtors.**

**Bankruptcy No. 1–81–01651.**

United States Bankruptcy Court,
E. D. Tennessee.

Feb. 8, 1982.

958

Mark J. Mayfield, Chattanooga, Tenn., for creditor, Ft. Oglethorpe State Bank.

Robert J. Harriss, Rossville, Ga., for debtors.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

In their chapter 13 plan, the debtors proposed to pay all their creditors in full, except for attorneys' fees added to unsecured claims. Fort Oglethorpe State Bank objected to confirmation of the plan, but not because of the proposal as to attorney's fees on unsecured claims. See *In re Clayborn*, 11 B.R. 117, 7 B.C.D. 843, 4 C.B.C.2d 882 (Bkrtcy.E.D.Tenn.1981).

The debtors owed the bank several debts, some of which were secured by the debtors' home. In their plan the debtors proposed to sell their home and make payments to the bank in the meantime. It appeared that some of the bank's objections would be moot if the debtors could sell their home. The court confirmed the plan subject to reconsideration in 90 days.

The bank made a motion to reconsider the confirmation and raised the same objections originally made. The bank also amended its objection to add other grounds. The court will rule on the objections in this memorandum except to the extent that they depend on the debtors' ability to sell their home. In that regard, the court will reconsider confirmation after 90 days.

This memorandum is in two parts. In the first part the court is concerned primarily with how a plan can deal with a claim secured only by a security interest in the debtors' principal residence, that is, the debtors' home. The debtors are indebted to the bank on three promissory notes. The primary collateral for two of them, the second mortgage note and the 90-day note, is the debtors' home. The court assumes in Part 1 that each of the notes is secured only by a security interest in the debtors' home. The court will treat each note as giving rise to a separate claim, though the bank filed only one proof of claim.

In Part 1 the court will also deal with several general objections and objections having to do with the plan's proposals as to payment of the debt due under the other promissory note, for which the primary collateral is a motor home.

For convenience, the findings of fact are separated into those most relevant to the separate parts of this memorandum.

### Part 1

#### Facts

On July 9, 1979, the debtors signed a note to the bank for $21,399.84 to be paid in 84 monthly installments of $254.76 beginning on August 15, 1979. The last monthly installment will be due on July 15, 1986. The note provides for a 5 percent delinquency charge, not to exceed $5.00, on each installment not paid within ten days of its due date and for 6 percent interest after maturity. The note also provides for payment of costs of collection, including 15 percent as attorneys fee, if collected by law or through an attorney at law. With regard to attorneys' fees, the note also provides that in the event of default in payment the debtors will pay all expenses of the holder of the note in collection or "in the enforcement of rights under any of the collateral, including reasonable attorney's fees and legal expenses."

The note is secured by a second mortgage on real estate, a house and lot, that is the debtors' principal residence.

About a year later the bank financed the debtors' purchase of a 1973 Sportscoach Motor Home. The note provides for 60 monthly payments of $217.25, beginning on September 5, 1980. The relevant provisions of the note are essentially the same as the provisions of the second mortgage note, as set out above, except the primary collateral is the motor home rather than the debtors' residence. The bank's security interest was noted on the certificate of title issued in September, 1980.

Finally, in June, 1981, the debtors executed a third note to the bank. It is a 90-day note. Payment in full, $957.00, was due on September 14, 1981, which fell after the debtors filed their chapter 13 petition but before the original hearing on confirmation. The note is also secured by the second mortgage on the debtors' home. The relevant provisions of the note are essentially the same as those of the second mortgage note, except it provides for interest of 10% per annum until paid in full.

The debtors did not pay the installments due on the second mortgage note in July and August, 1981, before they filed their petition in bankruptcy. They did not make the installment payment due in September, between filing and confirmation. The 90-day note came due between filing and confirmation and was not paid.

In their plan the debtors proposed to make the regular payments due on the

second mortgage note beginning with the payment due in November. The plan put the payments for September through October into a "special arrearage account" along with the amount due at maturity on the 90-day note. They proposed to pay $60.00 per month on the special arrearage account with 10% per annum simple interest until paid in full.

On the note secured primarily by the motor home, the plan proposed payments of $100.00 per month. The debtors' scheduled the motor home as worth $7,000.00. It was not assigned any value in the plan.

The plan proposed that the debtors would sell their residence, pay off the bank's second mortgage, and use the equity to pay unsecured debts. Furthermore, the monthly payments on the motor home debt would be increased to $300.00.

The debtors proposed to pay the trustee $572.00 per month until completion of the plan. According to the trustee's calculations the plan will require about 60 months to complete if the debtors do not sell their residence.

### Discussion

The bank in effect objected to everything about the plan that has anything to do with its claim or claims. The objections can be summarized as follows.

(a) As to the original debt secured by the second mortgage:

(1) The plan cannot provide for curing the defaults that occurred after the case was filed.

(2) The plan cannot provide for curing defaults and maintaining regular payments because the last payment on the debt will be due after the last payment under the plan.

(3) The plan does not propose to pay late charges and attorney's fees for collection.

(4) The proposed cure of defaults is not to be made within a reasonable time.

(5) The plan must provide that on default after confirmation, the bank can foreclose without further order of the court.

(b) As to the 90-day note:

(1) The only cure available is payment in full immediately.

(2) The plan must provide for payment of interest after maturity and an attorney's fee for collection.

(3) The proposed cure is not to be made within a reasonable time.

(c) As to the motor home debt:

(1) The beginning payments of $100 per month do not cover the depreciation. The debtors have the burden of proving it does.

(2) The increase in payments to $300 is too speculative since it depends on the debtors being able to sell their home. They do not have a buyer and the market is depressed.

(3) The motor home is valued too low.

(4) The motor home debt is also secured by the real property and must be paid from the proceeds.

(d) The debtors' attorney's fee must be paid in deferred cash payments (after payment on all other claims) over the length of the plan. In particular payment must be deferred to payments to cure the defaults that occurred after the plan.

(e) The plan's provisions on payment of the debtors' attorney's fee are vague and conflicting.

(f) The plan is not feasible because the debtors will be unable to sell their home.

(g) The plan was not proposed in good faith.

### 1

With regard to the plan's treatment of the second mortgage note, the bank relies on provisions of § 1322(b) of chapter 13.

(b) Subject to subsections (a) and (c) . . . the plan may—

. . . . .

(2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence* . . . ;

(3) provide for curing or waiving of any default;

. . . . .

(5) notwithstanding paragraph (2) . . . provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due;

. . . . .

(emphasis added).

The most significant question raised has to do with the meaning of subsections (b)(2) and (b)(5). According to the trustee's calculations, the last payment on the second mortgage note may be due before the last payment under the plan. The bank argues that under § 1322(b)(2) its rights cannot be modified, except as allowed by § 1322(b)(5), and it allows cure of defaults and maintenance of regular payments only if the last payment is due after the last payment under the plan.

The court has assumed that the second mortgage note and the 90-day note are each secured only by the debtors' home and as a result are within the scope of § 1322(b)(2).

There are cases that support the bank's argument as to the meaning of subsections (b)(2) and (b)(5). The court finds itself in almost complete disagreement with the reasoning of those cases. They involved "acceleration" of debts secured by the debtor's residence. The reasoning generally goes like this:

(1) When a note is accelerated, the entire balance comes due immediately.

(2) If the note is accelerated before filing, then the entire balance is due before the time of filing.

(3) The last payment on the note cannot be due after the last payment under the plan.

(4) Therefore, § 1322(b)(2) & (b)(5) do not allow cure of the default.

*In re Land,* 14 B.R. 132, 8 B.C.D. 90, 5 C.B.C.2d 145 (Bkrtcy.N.D.Ohio 1981); *In re Williams,* 11 B.R. 504, 7 B.C.D. 946, 4 C.B.C.2d 1028 (Bkrtcy.S.D.Texas 1981); *In re Canady,* 9 B.R. 428, 4 C.B.C.2d 113 (Bkrtcy. D.Conn.1981); *In re La Paglia,* 8 B.R. 937, 7 B.C.D. 333, 3 C.B.C.2d 717 (Bkrtcy.E.D.N.Y. 1981).

██ The court does not disagree with the result in all of the cases but only with the courts' reliance on § 1322(b)(5). Acceleration may affect the right to cure a default but subsection (b)(5) should not be relied on to deny the right to cure.

Consider a simple case. The debtors own a home on which they have been paying for 29 years of a 30-year mortgage loan. They have substantial equity in their home. They are compelled to pay large medical bills for a family member, and it causes them to miss one or two payments on the mortgage. For some reason the lender threatens to foreclose despite the debtors' obvious ability to pay if they are given time. The debtors file a chapter 13 case. Their plan will take three years. They have not missed any other mortgage payments. Are they prohibited from curing the two-payment default and from making their regular payments because the last mortgage payment comes due during the plan? Of course not. But the cited cases lead to that conclusion.

The legislative history supports the court's opposite conclusion that the debtors in the example could provide in the plan for curing the defaults and maintaining the regular payments. One of the problems with chapter 13's predecessor, Chapter XIII of the Bankruptcy Act, was that the plan could not protect the debtor's home. However, the court could enjoin foreclosure on the debtor's home, and the Bankruptcy Rules made the injunction automatic when the petition was filed. Bankruptcy Act § 614, 11 U.S.C. § 1014 (1976); Bankruptcy Rule 13–401. See generally 10 Collier on Bankruptcy ¶ 23.05 (14th ed. 1974). The creditor had to ask for relief from the stay. The court would continue the stay if the debtor provided for curing defaults within a reasonable time and maintaining the regular payments. See, e.g., *Hallenbeck v. Penn*

*Mutual Life Ins. Co.*, 323 F.2d 566 (4th Cir. 1963); *In re Garrett*, 203 F.Supp. 459 (N.D. Ala.1962).

By means of the automatic stay or a specific injunction, the court, rather than the plan, could protect the debtor's home. The new law was meant to allow the plan to accomplish this directly. The legislative history can be begun with the 1973 Report of the Commission on Bankruptcy Laws of the United States. H.Doc.No.93–137, 93d Cong., 1st Sess. (1973).

The commission recommended that:

The debtor be able to include in his plan a proposal for paying debts secured by liens on his residence and curing defaults thereon within a reasonable time.

Report, Part I at 13.

The Commission also remarked:

Moreover, since Chapter XII of the present Act is not carried in any form into the new Act, there is no reason for continuing the exclusion of a debt secured by real property used as a residence from the relief available to a debtor who proposes to pay his debts out of future income. Accordingly, the Commission recommends that the new Act authorize inclusion in any plan of ... provisions for curing defaults within a reasonable time and maintenance of payments while the case is pending on claims secured by a lien on a debtor's residence and on claims secured by personal property on which the last payment is due after completion by the debtor of all payments under the plan.

Report, Part I at 166.

The proposed statute provided:

A plan ... may include provisions for the curing of defaults within a reasonable time and maintenance of payments while the case is pending on claims secured by a lien on the debtor's residence and on unsecured claims or claims secured by personal property on which the last payment is due after completion by the debtor of all payments under the plan.

Report, Part II § 6–201(4) at 204.

The statute was explained as follows:

Clause (4) is new and confers limited authority to deal with claims secured by a lien on the debtor's residence and long-term claims which cannot be paid under the plan. The authority given to cure defaults by provisions in the plan is in addition to the authority to cure defaults given to the trustee by § 4–102(a). This clause does not authorize reduction of the size or varying of the time of installment payments nor, except in instances where the last payment on a claim secured by a lien on the debtor's residence is due during the term of the plan, is it contemplated that the claim would be fully paid off under the plan. Any unpaid balance would not be covered by a discharge granted pursuant to § 7–207. But, while the debtor is operating under the plan, he may be able to employ the authorization given under this clause to preserve his equity in his home and keep current on long-term debt by provisions in the plan for curing defaults and maintaining payments ....

Report, Part II at 205–206.

The Commission treated claims secured by liens on the debtor's residence and long-term claims as separate categories. The debtor was given authority to cure defaults and maintain regular payments on a claim secured by his residence, without regard to when the last payment was due. The debtor was also given authority to cure defaults and maintain regular payments on long-term claims, both unsecured and secured by personal property. The discharge provision was drafted so that debts dealt with under this provision would not be discharged. Of course, as the comments suggest, a debt secured by the debtor's residence might be "extinguished" by payment in full if the last payment came due during the plan. Discharge would be irrelevant in that situation.

The other available legislative history of subsections (b)(2) and (b)(5) is not very helpful. In the major House and Senate bills, subsection (b)(5) was the same. Subsection (b)(2) was not. The Senate bill provided that a plan could modify the rights of

holders of secured claims "other than claims wholly secured by mortgages on real property." The House bill did not include any such provision. H.R. 8200 & S. 2266 reprinted in Appendix 3, Collier on Bankruptcy (15th ed. 1981).

The present language was adopted as an amendment.

> Section 1322(b)(2) of the House Amendment represents a compromise agreement between similar provisions in the House bill and Senate amendment. Under the House amendment, the plan may modify the rights of holders of secured claims other than a claim secured by a security interest in real property that is the debtor's principal residence. It is intended that a claim secured by the debtor's principal residence may be treated with under section 1322(b)(5) of the House amendment.

124 Cong.Rec. S17,424 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini); 124 Cong.Rec. H11,106–11,107 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards).

The discharge section also excepts from discharge debts dealt with under § 1322(b)(5). 11 U.S.C. § 1328(a)(1) & (c)(1). It was meant primarily to except long-term debts on which payments will continue after the plan.

Sections 1322(b)(2) and (b)(5) fall short of the mark, apparently because of poor drafting rather than intent. Subsection (b)(2) limits what the plan can do as to claims secured only by the debtor's residence. Subsection (b)(5) applies notwithstanding that limitation, but fails to refer to claims secured only by the debtor's residence. Instead, it deals with claims on which the last payment is due after the last payment under the plan. There should be some overlap, but subsection (b)(5) confuses the authority to deal with claims secured only by the debtor's residence with the authority to deal with long-term debts that will not be discharged.

There is a way to avoid this confusion, at least to the extent of holding that the plan can provide for curing defaults and maintaining payments even though the last payment will be due during the plan. On this point, the court does not mean to deal with accelerated debts.

▪ Under the old law debtors could cure defaults and make regular payments on debts secured by their homes. This was accomplished through the adversary process if the creditor would not agree. In passing (b)(2) and (b)(5) of § 1322, Congress had two things in mind.

First, it wanted to allow chapter 13 debtors to protect their homes by curing defaults and making regular payments on their mortgages. Congress also wanted it to be clear that debtors could do this even if the debt would not be discharged. The important change in the law was in allowing the chapter 13 plan to provide for this directly, rather than relying on creditor agreement or the adversary process.

Second, Congress wanted to protect the lender secured only by a security interest in the chapter 13 debtor's home. Congress especially wanted to protect lenders secured by long-term mortgages. This policy and the first overlap, but the statute does a poor job of defining the extent to which they do not overlap.

▪ The solution to the problem in this case is simple. It must be said that curing defaults and maintaining regular payments on a claim secured only by the debtor's home does not "modify" the claimant's rights in violation of § 1322(b)(2). It is clear that it does not violate the policies that the statute was meant to further.

▪ Furthermore, though § 1322(b)(2) deals with the "rights of the holder of a claim", the emphasis should be on "claim". A claim is a right to payment. 11 U.S.C. § 101(4)(A). The special protection of § 1322(b)(2) prevents application of the "cram-down" provision, § 1325(a)(5)(B).[1]

---

1. The quote on page 11 of this opinion from the Bankruptcy Commission Report continues:

"With respect to short-term debts secured by personal property, the Commission recommends that the plan be permitted to include

Generally, the amount of a secured claim is the value of the collateral or the amount of the debt, whichever is less. 11 U.S.C. § 506. Section 1325(a)(5)(B) allows a plan to be confirmed if it provides for payment of the amount of the secured claim plus an allowance for the time-value of money while the claim is being paid. 11 U.S.C. § 1325(a)(5); *In re Lum*, 1 B.R. 186, 5 B.C.D. 1039, 1 C.B.C.2d 95 (Bkrtcy.E.D. Tenn.1979). Section 1322(b)(2) creates an exception to that rule for a claim secured only by a security interest in the debtor's principal residence. The plan cannot provide for any less than maintenance of the regular payments. Worse treatment would "modify" the claimant's rights in violation of § 1322(b)(2).

█ Thus, the plan can provide for curing defaults and maintaining regular payments without modifying the claimant's rights in violation of § 1322(b)(2). The authority given by § 1322(b)(5) amounts to specific authority for dealing with claims secured only by the debtor's residence *and* on which the last payment is due after completion of the plan.[2] Specific authority is not needed for such claims on which the last payment is due during the plan. General authority is found in subsection (b)(3) on curing defaults and in subsection (b)(10), which allows the plan to include any provision not inconsistent with the Bankruptcy Code.

█ Accelerated debts should be considered separately. Subsections (b)(2) and (b)(5) do not precisely define what a plan can do as to claims secured only by the debtor's residence. Whether a debtor can cure defaults despite acceleration should depend on the debtor's rights under state law

provisions dealing with such claims severally . . . . The proposal does not contemplate that the creditor . . . should be entitled to insist that the plan strictly preserve all the terms of his original contract if the value of his claims against the property . . . is preserved. Insofar as there is a deficiency of the collateral . . . he may and should be treated as a member of the class of unsecured creditors."
Report, Part I at 166.

in light of the purposes of chapter 13 and the need for certainty in the home mortgage market. See *In re Taddeo*, 9 B.R. 299, 7 B.C.D. 422, 4 C.B.C.2d 185 (Bkrtcy.E.D.N.Y.1981) *aff'd* 15 B.R. 273 (U.S.D.C.E.D.N.Y. 1981); *In re Acevedo*, 9 B.R. 852, 4 C.B.C.2d 178 (Bkrtcy.E.D.N.Y.1981); *In re Beckman*, 9 B.R. 193, 7 B.C.D. 361 (Bkrtcy.N.D.Iowa 1981); *In re Soderlund*, 7 B.R. 44, 3 C.B. C.2d 255 (Bkrtcy.S.D.Ohio 1980);[3] *In re Coleman*, 2 B.R. 348, 5 B.C.D. 1300 (Bkrtcy. W.D.Ky.1980); *In re Breuer*, 1 C.B.C.2d 722 (Bkrtcy.S.D.N.Y.1980). It should not be held that cure is automatically unallowable because the last payment is due during the plan.

█ It is not convincing to say that creditors hesitate to accelerate. *In re La Paglia*, 8 B.R. 937, 7 B.C.D. 333, 338–339, 3 C.B.C.2d 717 (Bkrtcy.E.D.N.Y.1981). That may be true, but the courts should not restrict chapter 13 with an interpretation of the statute that is unnecessary and can be unjust. Subsections 1322(b)(2) and (b)(5) do not contemplate what a plan can provide as to accelerated debts.

█ The court concludes that the debtors can cure defaults and maintain regular payments on the second mortgage note even if the last payment will be due before the last payment under the plan is due.

The main point of the special protection of § 1322(b)(2) is to preserve the right to the regular payments as provided in the contract. Does it preserve the right to collect other charges also provided for in the contract that is the basis of the claim?

The answer depends somewhat on the hazy relationship between § 506 and § 1322(b)(2).

2. In *In re Dupree*, Judge Gartner in effect ruled that § 1322(b)(5) did not pertain to claims on which the last payment was due during the plan. 6 B.R. 476 (Bkrtcy.S.D.Ohio 1980). The actual question was whether the defaults had to be cured before the last payment on the claim was due.

3. The bankruptcy court decision has been overruled by the district court on the basis of § 1322(b)(5).

■ Section 506 determines the extent to which a claim is a "secured claim" for bankruptcy purposes. That depends on the value of the collateral. If the value of the collateral is greater than the amount of the debt, then the claim is oversecured. This is important because of § 506(b). It provides that the holder of an over-secured claim is entitled to recover out of the collateral interest after bankruptcy and reasonable fees, charges and costs provided for in the contract that is the basis of the claim. In other words, those charges and interest are secured only if the collateral is worth more than the amount of the debt.

On the other hand, § 1322(b)(2) provides that the chapter 13 plan cannot modify the rights of the holder of a claim secured only by a security interest in the debtor's principal residence. How does § 506(b) relate to this?

■ Obviously, § 506(b) does not affect the right to receive the regular payments. The court believes it does not affect the right to recover the other charges, costs, interest after maturity on defaulted payments, and attorney's fees provided for by the contract. If the main purpose of § 1322(b)(2) is to preserve payment rights, then it should also preserve these. Section 506 does not determine the right to payment, but only whether the claim is secured or unsecured. Chapter 13 may require full payment of some unsecured claims. Priority claims are another example. 11 U.S.C. § 1322(a)(2).

As to the payment of interest after maturity on the 90-day note, the plan as amended proposes to pay 10% interest on the special arrearage account that includes the amount due at maturity. The note does not explicitly provide for interest after maturity but provides for interest of 10% per annum until paid in full. If this is the interest due after maturity, then it is provided for by the plan.

The second mortgage note also provides for a default charge of 5% up to a maxi-

mum of $5.00. That means the late charges would be $5.00 on each of the four defaulted payments. However, the plan proposes to pay 10% interest after maturity on the defaulted payments rather than only 6% as called for by the contract. At best the bank would be entitled to add the $20.00 in late charges and receive 6% interest on the total. It appears that would be less than the extra 4% on the defaulted payments without the late charges.

■ On this point the court must point out that defaults to be cured within a reasonable time are not exactly like allowed secured claims. Under § 1325(a)(5)(B) an allowed secured claim is paid with interest to cover the time-value of money. The contract rate should not control the court's decision as to the rate of interest to be applied. See, e.g., *In re Benford,* 14 B.R. 157, 8 B.C.D. 117, 5 C.B.C.2d 79 (Bkrtcy.W. D.Ky.1981); *In re Klein,* 10 B.R. 657, 7 B.C.D. 668, 4 C.B.C.2d 412 (Bkrtcy.E.D.N.Y. 1981).[4]

However, as to a claim secured only by the debtor's home, the general idea of § 1322(b)(2) is that the contract will remain in force as to the amount of payment. The claimant should be paid the interest after maturity for which the contract provides. The time-value of money is irrelevant. The court re-emphasizes that § 1322(b)(2) creates a special exception to § 1325(a)(5)(B).

The plan provides that the trustee will make the regular monthly payments to the bank. It is unclear whether the bank is arguing that the plan must provide for payment of late charges and interest after maturity on regular payments not made by the trustee within the time allowed by the contract. There was no proof on whether the trustee will make the regular payments within the time allowed by the contract. The court assumes that he will.

■ The language of the notes is broad enough to give the bank the right to pay-

---

**4.** The difficult question is whether the rate should be high enough to produce a profit for the lender. Common sense says this is con-
trary to the concept of the time-value of money, but some courts have concluded otherwise.

ment of a reasonable attorney's fee in this case. Based on the assumptions thus far, the plan must provide for payment of such attorney's fees. The bank's attorney chose not to file a claim until the court decided this question. The court could allow the debtors an opportunity to modify their plan to provide for payment, but that may not be necessary. The plan provides for payment in full. The bank's claim may be amended to include attorney's fees. In any event, the final decision must await the court's decision in the second part of this memorandum.

■ Section 1322(b)(2) protects the right to payment on a claim secured only by a security interest in the debtors' principal residence. It certainly does not preserve the right to foreclose without further order of the court if there is a default in payments during performance of the plan.

In a liquidation case it is clear that the court is to control and protect the debtor's possession of his property and property of the estate. 11 U.S.C. § 362(a)(3), (a)(4), (a)(5), (c) & (d). In a chapter 13 case, the right to possession after confirmation is controlled by the plan and the order of confirmation. 11 U.S.C. § 1327. If they contemplate that the debtor will remain in possession during performance of the plan, then a party with an interest in the property cannot interfere with the debtor's possession except with leave of the court. Section 1322(b)(2) does not require different treatment for a party with claim secured only by a security interest in the debtor's home.

■ The new law allows a plan to deal directly with such a claim. It recognizes the major justification under the old law for continuing the stay of foreclosure—the necessity of the home to the debtor's performance of the plan. The bank argues that even though its claim can be dealt with by the plan, it must have the right to terminate the plan automatically if the debtor defaults in its performance. The rights protected by § 1322(b)(2) do not include the right to control the performance of a chapter 13 plan. The legislative history makes it clear that under the new law no one

creditor is to have veto power over confirmation of a chapter 13 plan. Likewise, no one creditor can control its performance. The bank's argument fundamentally misinterprets the law.

For the same reasons, a provision such as the one argued for by the bank would also be improper. Any failure to make payments would be a failure to perform the plan. The question of whether the plan should continue must be presented to the court. One creditor among many should not be allowed to decide.

There remains the question of how the plan can treat the 90-day note in light of the provision of § 1322(b)(2).

■ The special protection of § 1322(b)(2) was meant to protect holders of long-term home mortgages, rather than holders of short-term notes such as this. Nevertheless, the provision of § 1322(b)(2) is not so limited. The legislative history cannot amend the plain language of the statute. Earlier the court explained that subsections (b)(5) and (b)(2) do not precisely overlap. As a result, subsection (b)(2) cannot be limited to long-term debts by interpreting it in light of subsection (b)(5). The court concludes that the 90-day note is within the protection of § 1322(b)(2).

It is important to remember the § 1322(b)(2) says what *the plan* cannot do. Consider the situation if a 90-day note such as this one was to come due during performance of the plan. The limitation of § 1322(b)(2) has to do primarily with the time and amount of payment. The plan would have to provide for payment in full when the note matured. Any other provision would modify the rights of the holder of the claim contrary to § 1322(b)(2).

In this case, however, the note came due after filing but before performance of the plan was to begin. At the time of confirmation the note was in default. The situation is somewhat like the acceleration cases, since the note was due in full and was in default before performance of the plan began. The question is whether cure of the default should be allowed.

The question also brings up another issue raised by the bank—whether the plan can provide for curing defaults that occur after filing.

Under the old law, cure of post-filing defaults was accomplished through use of the automatic stays or the injunctive process. As a practical matter, the original plan must be able to provide for cure of defaults that occur before the first payments are to be made under the plan. A plan is effective at the earliest when it is confirmed. Chapter 13 does not provide for issuance of an income deduction order until confirmation. 11 U.S.C. § 1325(b). The plan should be able to provide for curing defaults that occur before its performance begins.[5]

Defaults thereafter are curable, but the question of whether cure should be allowed is different. The provision on not modifying the mortgagee's rights generally means that the plan originally must provide for maintenance of the regular payments. Failure of the trustee or the debtor to make the payments means that the debtor has failed to perform the plan. Of course, the mortgagee is not automatically entitled to foreclose, and the debtor may be allowed to cure the default. The situation is different from confirmation, however, because no matter how the question is raised it still involves failure to perform the plan.

The court concludes that the statute allows the plan to provide for curing the defaults that occurred after filing, that is, the two payments on the second mortgage note and the amount due at maturity on the 90-day note.

The court also concludes that cure of the 90-day note should be allowed. The debt is technically within the special protection of § 1322(b)(2) but is outside its intended scope. Stability in the home mortgage market and other such considerations are of little weight in deciding whether cure

should be allowed. Furthermore, the amount in default is small in comparison to the outstanding balance of the second mortgage and the debtors' apparent equity in the property. Finally, the default may be cured earlier than proposed if the debtors are able to sell their home.

The debtors put the $957.00 due on the 90-day note and the four defaulted payments on the second mortgage note into a "special arrearage account" to be paid $60 per month plus 10% simple interest. It will take about three years for the debtors to pay the special arrearage account. The bank argues that this is not a reasonable time.

A "reasonable time" cannot be precisely defined. It is easier to decide whether the proposed cure will take an unreasonable length of time. The court cannot say that the proposed cure in this case will take an unreasonable time. The four payments in default were due shortly before and after the debtors filed their chapter 13 petition. They are not seeking to cure defaults that were already old when the case was filed. If the debtors are able to sell their home, the defaults will be paid earlier. The bank did not present any evidence or make any specific arguments on why three years should be considered too long. The bank's argument is rejected.

The bank also argued that payments to cure the post-filing defaults cannot be postponed to payment of the debtor's attorney's fee, which will be paid as an administrative expense. See *In re Parker*, 15 B.R. 980 (Bkrtcy.1981).

The court has already decided that the post-filing defaults are defaults for which the original plan can provide a cure. They are not entitled to any better treatment than the defaults that occurred before filing. Nevertheless the court will address the question of what "priority" should be given to payments to cure the defaults.[6]

---

**5.** This is a rule that cannot be overextended to cover many defaults in a case where there is a long delay between filing and confirmation. In

such a case there probably will be cause to deny confirmation.

**6.** "Priority" technically concerns only unse-

■ The regular payments on a claim entitled to the special protection of § 1322(b)(2) must be made. The plan must be structured around that requirement. It must provide for maintenance of the regular payments and allow the trustee to pay administrative expenses as required by the statute. Otherwise, the plan cannot be confirmed. Thus, § 1322(b)(2) in effect requires that the regular payments be made concurrently with other payments under the plan.

Payments to cure defaults also have this kind of built-in concurrentness. The plan must provide for cure within a reasonable time and be otherwise confirmable. Usually the plan will be structured to make regular payments to cure the default. Thus, the requirement of cure within a reasonable time leads to built-in concurrentness.

■ However, the default claim is not necessarily a secured claim. Section 506 still determines the extent to which a claim is secured. Consider a case where the home mortgage debt is greater than the value of the home. The claim is secured only up to the value of the home. Section 1322(b)(2) preserves the right to payment as provided in the contract, but it does not make the claim fully secured or oversecured. Likewise, the requirement of cure within a reasonable time does not make the claim for the defaulted payments secured. The claim may be unsecured. If so, the plan may provide for cure within a reasonable time without providing that the cure payments be made as payments on a regular secured claim.

This is consistent with the court's reasoning on how § 506 relates to § 1322(b)(2) as to payment of fees, charges, and costs that can be added under the contract. As to them also, § 506 still controls whether they are secured or unsecured. Section 1322(b)(2) only requires payment.

■ The result can be summarized as follows. The regular payments on a claim

protected by § 1322(b)(2) must be made concurrently with payments on administrative expenses. Payments to cure a default are not entitled to that treatment, but at best to payment as other secured claims. Administrative expenses can be paid in full before any payment on other secured claims. The trustee, however, will make concurrent payments on both. See *In re Parker*, cited above. The plan provides for payment of $60 per month on the defaulted amount. That payment will be made concurrently with payment on administrative expenses. The claim is not entitled to any better treatment.

The court has already noted that cure of defaults that occur during performance of the plan can be allowed, but the question is whether the plan should be allowed to continue as to the secured creditor. In light of § 1322(b)(2), cure of defaults that occur during performance may require special treatment, but on the facts of this case, the issue is not properly presented.

The bank's general objections to the plan's provisions on payment of the debtors' attorney's fee were adequately dealt with in *Parker.* The court adopts its opinion and rejects the bank's argument.

That brings the court to the objections concerning the proposed payments on the motor home note.

■ The bank contends that the motor home was valued too low. The argument is irrelevant. The plan proposes to pay the debt in full rather than as allowed by § 1325(a)(5).

■ The bank contends that $100 per month does not cover the monthly depreciation of the motor home, and therefore, its interest is not adequately protected. 11 U.S.C. §§ 361 & 363(e).

The court refers to its earlier decision in *In re Parker*, cited above. After confirmation "adequate protection" is not relevant to what must be paid on an allowed secured claim. If the total to be paid satisfies the

cured claims. The court, however, will use it with regard to the order of payment on all claims, secured and unsecured. Locally, "pre-

ferred" is used to describe payment on allowed secured claims.

confirmation standard, then the plan can be confirmed without regard to whether the periodic payments will cover depreciation. The bank has not argued that payment in full is not sufficient to allow confirmation.

Of course, the debtors need only propose a plan to pay enough to satisfy the confirmation requirements. They have no burden of proving that the monthly payments will be at least as much as the monthly depreciation. The bank's argument on this point is rejected.

The argument concerning the speculativeness of payment in full will be dealt with separately, since it involves whether the debtors can sell their home.

Later in this memorandum the court will consider whether the motor home debt is also secured by the debtors' home.

 The bank also argued that the plan was not proposed in good faith. That is the extent of the bank's explanation of this objection. The facts show that the plan not only was proposed in good faith but requires of the debtors diligent effort. The objection is unfounded.

The bank argued that the plan is not feasible because it depends on sale of the debtors' home and that is unlikely, or at least the debtors have not shown that it is likely. Because the plan depended on sale of the debtors' home, the order of confirmation provided that the court would automatically reconsider after 90 days. The court will reconsider after a hearing on the matter. This objection will be dealt with then.

### Part 2

The general question addressed in this part is what debts are secured by what property. The answer is important because the special protection of § 1322(b)(2) extends only to claims secured only by a security interest in the debtor's principal residence.

Much of what the court has already decided could be made irrelevant by the court's decision on this question. The court believes it was nonetheless necessary to consider the earlier questions. The answers are important to understanding how chap-ter 13 is supposed to work. Moreover, the court can preclude the possibility of more than one appeal. That is particularly appropriate in a chapter 13 case which requires the debtor's continuing voluntary effort.

The bank argued that the motor home debt is also secured by the debtors' home. The court assumed that the second mortgage note and the 90-day note were each secured only by a security interest in the debtors' home. The question is whether the bank's argument and the court's assumption are correct.

As a preliminary matter, the court should consider the fact that the bank filed only one proof of claim. Based on that fact alone, the court should treat the bank as having only one secured claim, secured not only by the debtors' home but also by the motor home. The claim would not be entitled to the special protection afforded by § 1322(b)(2) for claims secured only by the debtors' home. In the future if the bank combines claims in this manner, it will be treated as having one secured claim.

The court is not saying that a proof of claim can never include more than one claim. In many situations it may not cause any problem and may indeed be convenient for the creditor, the debtor, and the chapter 13 trustee. Nevertheless, if a creditor intends to argue that it has a claim entitled to the special protection of § 1322(b)(2), it should file one proof of claim for that claim. Such claims are distinct from all other claims in chapter 13.

In this regard, the court would like to reemphasize a point made earlier. When the special protection of § 1322(b)(2) applies to a claim, § 1325(a)(5)(B) is irrelevant. It allows confirmation of a plan if it provides as to a secured claim that the creditor will retain its lien and be paid under the plan the value of its allowed secured claim as of the effective date of the plan. On the other hand, if the secured claim is within the special protection of § 1322(b)(2), the creditor's rights under the claim cannot be "modified". That means

the creditor must retain its lien. More importantly, it means the contract and not subparagraph (B) controls what must be paid on the claim. Indeed, § 1322(b)(2) was meant to put such claims outside the scope of § 1325(a)(5)(B).

To determine what property secures what debts, the court must look to the agreements between the bank and the debtors. None of the three notes provides that it is secured by the debtors' home and other property. The problem arises because the notes broadly define collateral and contain other provisions meant to tie them together.

### Facts

The second mortgage note and the motor home note use the same description of collateral. It includes the property specifically described and

> any other property of every kind or description (excepting, unless otherwise herein specifically provided, real estate which is used or expected to be used as a principal residence of the undersigned) now or hereafter in the possession or control of the Holder for any reason, including all dividends and distributions on or other rights in connection with any property hereinabove referred to.

The 90-day note has the same description of the collateral except it also includes

> any and all balances, credits, deposits, accounts, items and monies of the undersigned now or hereafter with the Holder, which balances and the like undersigned hereby conveys and transfers to Holder. . . .

Each of the notes contains what may be called an "other indebtedness" clause.

> The undersigned agrees that the Holder shall have a lien upon, security title to and a security interest in the Collateral to secure the payment of this Note and all other indebtedness or liability of the undersigned to Holder, however and whenever incurred or evidenced, whether direct or indirect, absolute or contingent, or due or to become due (hereafter with this Note collectively called "Liabilities"). The surrender of this Note upon payment

or otherwise shall not affect the right of the Holder to retain the Collateral for any other Liabilities. . . .

The second mortgage provides that it is given to secure the second mortgage note and "any other present or future indebtedness [or] liability" of the debtors to the bank.

The debtors and the bank also executed a security agreement covering the motor home. It provides that the security interest in the motor home secures the motor home debt and

> all other obligations of the undersigned to the Bank, its successors and assigns, however created, arising or evidenced, whether direct or indirect, absolute or contingent, or now or hereafter existing, or due or to become due.

As with the notes, the security agreement goes on to provide that all the secured obligations are called the "Liabilities".

The notes also contain remedy provisions that might be called "linking" provisions. For example, the second mortgage note provides:

> In addition to all other rights possessed by it, the Holder, from time to time, whether before or after any of the Liabilities shall become due and payable, may . . . (e) exercise such additional rights and powers, if any with respect to any security for or guaranty of any of the Liabilities, as may be provided in any written instrument in addition to this Note.

The omitted provisions (a)–(d) have to do mostly with rights against the collateral.

The note further provides:

[I]f undersigned shall fail to meet at maturity any indebtedness or liability to the Holder . . . (1) any and all of Liabilities may, at the option of the Holder . . . be declared, and thereupon immediately shall become due and payable, . . . (3) the Holder may exercise from time to time any rights and remedies . . . available to Holder, including those available under any written instrument (in addition to this Note) relating to any of the Liabili-

ties or any security therefor .... Any proceeds of any disposition of Collateral may be applied by the Holder to the payment of expenses in connection with the collateral including reasonable attorney's fees and legal expenses, and any balance of such proceeds may be applied by the Holder toward payment of such of the Liabilities, and in such order of application, as the Holder may from time to time elect.

The other notes also contain these provisions.

The security agreement that accompanies the motor home note also provides:

Whenever a Default shall be existing, the Note and all other Liabilities may (notwithstanding any provisions thereof), at the option of the Bank, and without demand or notice of any kind, be declared, and thereupon immediately shall become due and payable, and the Bank may exercise from time to time any rights and remedies available to it under applicable law.

### Discussion

The description of collateral brings in property not specifically described only when it comes into the bank's "possession or control". Possession and control have variable meanings. Each note could have included a dragnet provision making the collateral for any other note also secure it. The linking provisions of the note would be largely unnecessary or much simpler. The notes, however, do not include specific dragnet provisions. The court concludes that "possession or control" as used in the description of collateral require more than having a security interest in tangible property over which the debtors have actual, physical dominion. Thus, the collateral for one note is not automatically collateral for others.

Furthermore, the debtors' home would not be collateral for the motor home note, even if it came into the bank's possession or control. The description of collateral excludes the debtors' home.

The description of "Collateral" leads to the following conclusions:

(1) If the bank obtained possession or control of the motor home, it would become "collateral" for the two notes otherwise secured by the debtors' home.

(2) If the bank obtained possession or control of the debtors' home, it would not become "collateral" for the note secured by the motor home.

If the description was the only relevant provision of the notes, the court's earlier assumptions would be correct. The second mortgage note and the 90-day note would not be secured by a security interest in the motor home. Though it could become collateral for them, it has not. The bank's argument would also be wrong. The debtors' home is excluded from ever becoming collateral for the motor home note. However, the "other indebtedness" and "linking" provisions of the notes complicate matters.

██ In the motor home note, the other indebtedness clause gives the bank a security interest in the motor home to secure payment of the other notes. In the other notes, the other indebtedness clauses give the bank a security interest in the debtors' home to secure payment of the motor home note. Thus, even though the debtors' home is not "collateral" under the motor home note, the other notes create a security interest in it to secure the motor home note as "other indebtedness". The result is that the bank has a security interest in the debtors' home to secure the motor home note and a security interest in the motor home to secure the other notes.

The linking provisions in effect provide that a default on one note can be treated as a default in the others, with the bank being entitled to the remedies given by the other notes. The bank is not required to apply the proceeds of any item of collateral to payment of the note it specifically secures.

The essence of security is the right to take the debtor's property for payment when the debtor fails to pay. The court must say that the bank has a security inter-

est in the debtors' home and their motor home to secure payment of any of the three notes.

The only way to avoid that conclusion is to put a narrow interpretation on the meaning of security interest. Security interest is defined in the Bankruptcy Code as a lien created by agreement. 11 U.S.C. § 101(37). Lien is defined as a charge against or interest in property to secure payment of a debt or performance of an obligation. 11 U.S.C. § 101(28). Thus, a security interest under the Code is a charge against or interest in property created by agreement for the purpose of securing payment of a debt or performance of an obligation. The bank's various security interests fit within that definition.

It can be argued that the definition should be construed according to general understanding rather than the boilerplate language of typical consumer loan agreements. The general understanding is that when a person obtains a loan and gives security for repayment, then the specified property secures repayment of that loan only. Other loans and the collateral for them are thought of as independent transactions. Nevertheless, general understanding does not make the contract provisions unenforceable. The court is not aware of any law that makes the provisions unenforceable. The court concludes that the second mortgage note and the 90-day note are secured by a security interest in the debtors' home and a security interest in the motor home.

■ It follows that neither note gives the bank a claim entitled to the special protection of § 1322(b)(2). For many lenders, the court's decision appears to limit the special protection of § 1322(b)(2) to lenders engaged *only* in home financing. See *United Companies Financial Corporation v. Brantley,* 6 B.R. 178, 189, 6 B.C.D. 932, 938 (Bkrtcy.N.D.Fla.1980).[7] Lenders often use

form agreements with essentially the same boilerplate language as these notes. If the lender has made more than one loan and any of them is secured by property other than the debtor's home, the boilerplate language will make the special protection of § 1322(b)(2) inapplicable.

The facts may exclude a claim from the protection of § 1322(b)(2), because the lender has made other loans to the debtor that are secured by other property, but the statute itself cannot be construed to apply only to the claims of lenders engaged only in home financing. Its language is not so strict. Furthermore there may be few such lenders. Federal savings and loan associations, traditionally a major source of home financing, are not limited only to that kind of lending. 12 U.S.C. § 1464(c). That leaves the possibility that a claim can be within the special protection of § 1322(b)(2) if the lender has made only one loan or if the different loan agreements are not tied together by the boilerplate language like that used in these notes.

The court's conclusions also amount to holding that the bank has one secured claim. Even though the secured loans were not consolidated under one agreement, the language of the separate agreements in effect made them one. As a practical matter, it is a factual question whether debts owed under separate agreements give rise to one or more than one claim. In this case, the bank had only one claim.

Finally, the court's conclusions mean that the bank's one secured claim is secured by both the debtors' home and motor home. The claim is not protected by § 1322(b)(2). Section 1325(a)(5) establishes the minimum treatment to which the bank's claim is entitled. The question is whether the plan is confirmable under § 1325(a)(5).

The plan was proposed, objected to, and confirmed on the assumption that § 1322(b)(2) protected at least one of the

---

**7.** "Although the legislative history is silent, the plain intent of the exception is to provide stability in the residential long-term home financing industry and market. It is to specifically protect institutional lenders engaged only in providing long-term home mortgage financing and not lenders primarily engaged in consumer or other areas of financing but who take security interests in a residence or homestead to secure non-home financing debts."

bank's claims. Since § 1325(a)(5) controls, it is difficult to say exactly whether the plan is confirmable or not. Generally it should be, since 100% payment is proposed, but the bank may need to amend its claim.

The court will allow the plan to continue in its present form, but will set a hearing to reconsider the debtors' proposal to sell their home and also to consider whether the plan should continue as is or should be modified.

In light of the importance of the questions raised and answered in this memorandum, the court intends to make its order accompanying this memorandum final and appealable even though other questions regarding the plan will be considered at the rehearing.

This memorandum constitutes findings of fact and conclusions of law pursuant to Bankruptcy Rule 752.