**In re Adela J. HOBAICA, Debtor.**

**Bankruptcy No. 86–00322.**

United States Bankruptcy Court, N.D. New York.

Oct. 17, 1986.

Charles E. Crandall, Jr., Herkimer, N.Y., for Signal Finance of New York, Inc.

James F. Selbach, Syracuse, N.Y., for debtor.

Warren V. Blasland, Syracuse, N.Y., Trustee.

STEPHEN D. GERLING, Bankruptcy Judge.

### MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

May a Chapter 13 plan modify the rights of a creditor holding a fully secured interest solely in a debtor's residence when the underlying indebtedness arose as a result of a short-term, non-purchase money loan? While various courts have antithetically resolved the question, the Court's analysis of the sparse legislative history, application of bedrock principles of statutory interpretation, and consideration of the rationale of

those courts having been concerned with the same or similar issues, leads to the determination that § 1322(b)(2) of 11 U.S.C. ("Code") is to be construed as enacted, with confirmation of Debtor's proposed plan thus denied.

## FINDINGS OF FACT

Adela A. Hobaica ("Debtor") filed her petition for relief under Chapter 13 of the Code on March 18, 1986. On May 12, 1986, Signal Finance of New York, Inc. ("Signal") filed a proof of claim and objection to confirmation of Debtor's plan. An evidentiary hearing was held on August 8, 1986, with the Court having jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(L) and 1334.

On or about February 9, 1983, Signal loaned Debtor $22,986.24, and evidenced the indebtedness by having the latter execute a Combined Note and Statement of Loan. Signal secured the loan by taking a collateral first mortgage on Debtor's principal residence at 5 Irving Place in Utica, New York, and the mortgage was recorded in the Oneida County Clerk's office on February 11, 1983.

The mortgage is not subject to set-off or counterclaim. Original terms provided for a percentage rate of twenty per cent (20%) per annum on the unpaid balance, with monthly payments of $609.00. Payments were to be for a period of five (5) years, commencing March 16, 1983, and ending February 16, 1988. Debtor made monthly payments until February, 1986, and at the time she filed her bankruptcy petition, the unpaid principal balance was $15,434.72.

Debtor testified the loan proceeds were not used to purchase her residence. Rather, the money was used to settle other household and personal expenses. In particular, Debtor used the loan proceeds to reduce obligations on other parcels of real property she owned. Debtor's residence was scheduled with a market value of $45,000.00, and Signal has not contested this figure.

Signal's regional manager for the territory embracing Debtor's property testified at length concerning Signal's position as a "true" mortgage lender. Signal has over ten offices in the upstate New York area, with the Syracuse-Utica region generating over $38,000,000.00 in mortgage business in 1985–86. Mortgages constitute sixty per cent (60%) of Signal's total lending operations in the region.

Generally, when Signal is granted a first mortgage in real property as a result of a purchase money loan, terms for re-payment average twenty to thirty years, with interest rates thereon ranging from thirteen to nineteen per cent per annum. Second mortgage (presumably collateral mortgages) terms average five to fifteen years in length, with interest rates of fourteen to twenty per cent per annum thereon. Signal is not primarily involved in the purchase money mortgage market; during a recent reporting period, Signal was given thirty-two first mortgages (presumably collateral mortgages), twelve purchase money mortgages, and re-financed an additional twenty mortgages.

Signal objects to Debtor's plan on the grounds that while it proposes to pay the full principal balance due the lender, a reduction in interest to twelve per cent (12%) per annum, and extension of time for re-payment for the 60 months following confirmation is intended. Signal contends the proposed modifications contravene Code § 1322(b)(2).

## CONCLUSIONS OF LAW

Code § 1322 provides:

(b) subject to subsections (a) and (c) of this section, the plan may—

.     .     .     .     .

(2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; (emphasis added).

As the Court is asked to construe and interpret this section, the proper starting

point is the language of the statute itself. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (Powell, J., concurring), *reh'g denied* 423 U.S. 884, 96 S.Ct. 157 (1975). *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). While the "plain meaning" of a statute generally evidences the Congressional intent behind its enactment, *Watt v. Alaska*, 451 U.S. 259, 266 n. 9, 101 S.Ct. 1673, 1678 n. 9, 68 L.Ed.2d 80 (1981), a court is not precluded from considering other "persuasive evidence if it exists." *Boston Sand & Gravel Co. v. United States*, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928) (Holmes, J.). The fact that certain words are not to be taken literally may be evidenced by the circumstances surrounding congressional enactment. *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 514, 36 L.Ed. 226 (1892).[1]

The present dispute centers upon Debtor's contention that the exception to modification of secured status contained in Code § 1322(b)(2) was legislatively intended to apply only to long term, purchase money mortgages for a debtor's residence. *In re Morphis*, 30 B.R. 589, 592–93 (Bankr.N.D. Ala.1983); *In re Bruce*, 40 B.R. 884, 887 (Bankr.W.D.Va.1984); *In re Paige*, 13 B.R. 713, 714–15 (Bankr.S.D.Ohio 1981); *United Companies Financial Corp. v. Brantley*, 6 B.R. 178, 189 (Bankr.N.D.Fla.1980). Signal relies upon a later line of cases strictly construing Code § 1322(b)(2). *In re Bradshaw*, 56 B.R. 742, 746 (S.D.Ohio 1985); *In re Coffey*, 52 B.R. 54, 55 (Bankr.D.N.H. 1985); *In re Hubbard*, 30 B.R. 39, 40 (Bankr.W.D.Mo.1983); *In re Simpkins*, 16 B.R. 956, 972 (Bankr.E.D.Tenn.1982).

The legislative history surrounding enactment of Code § 1322(b)(2) is extreme in its paucity. The House of Representatives report concerning H.R. 8200 (the House version of the revised Bankruptcy Code) emphasized that the rights of *any* secured creditor could be modified by a Chapter 13 plan. *See* H.R. No. 595, 95th Cong.2d.Sess. 124, n. 47, 429, *reprinted in* 1978 U.S. CODE CONG. & AD.NEWS, 5787, 5963, 6085, 6384. On the other hand, S.2266 (the Senate's version of the Bankruptcy Code), allowed Chapter 13 plan modification of a secured debt unless it was "wholly" secured by a real estate mortgage. *See*, S.Rep. No. 989, 95th Cong.2d Sess. 141, *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 5787, 5927. A compromise between the at-odds language was announced,[2] yet the Code as enacted substituted the word "only" for "wholly", and restricted the "no modification" exception to security interests in debtor's principal residence. Some courts have questioned whether the change in terminology was intentional. *In re Neal, supra* at 539. Others, commenting on the dearth of legislative history, have strictly construed the statute for a variety of reasons. *See, e.g.*, *In re Stratton, supra* at 46 (to read statute other than as written would render it meaningless); *In re Hubbard, supra* at 40 (no special protection for similarly placed long-term, purchase money residential lenders in a Chapter 11 case); *In re Simpkins, supra* at 966 (indeterminable intent cannot override language used).

The Court hesitates to utilize sketchy legislative history as justification for ignoring the plain statutory language. Manipulation of unambiguous legislation phraseology, and reliance upon rules of statutory construction should be constrained to those instances where express Congressional pur-

---

**1.** "Of course, it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative dis-

covery is the surest guide to their meaning." *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.) *aff'd.*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

**2.** *See*, CONG.REC. H11,106 (Sept. 28, 1978) (remarks of Rep. Edwards) *reprinted in* 9 Bkr. L.Ed. Legislative History § 81:3, p. 56 (1979).

pose would be frustrated by a court's unwavering fixation on the printed word. For even if the original term "wholly" had remained in the final version of the Code, Signal would be justified in objecting to modification of its claim, for it is fully secured *only* and *wholly* by an interest in Debtor's residence. Thus, upon the facts as presented, and under any reading of Code § 1322(b)(2), Signal's interest may not be modified, with its objection to confirmation therefore sustained.

IT IS SO ORDERED.