**In re George Michael MORPHIS, Debtor.**

**Bankruptcy No. BK82–6669.**

United States Bankruptcy Court,
N.D. Alabama.

April 18, 1983.

---

Walter P. Crownover, Tuscaloosa, Ala., for debtor.

Glenn N. Baxter, Tuscaloosa, Ala., for Transamerica Financial Services, Inc.

## MEMORANDUM OPINION

GEORGE S. WRIGHT, Bankruptcy Judge.

### FINDINGS OF FACT

The Court makes the following findings of fact:

(1) On July 5, 1979, the debtor and his wife, Denise Morphis, purchased a new 1979 Shiloh mobile home from Johnson Trailer Sales, Meridian, Mississippi. Principal financed was $20,864.50 at 180 monthly installments of $263.70—12.98% APR. Johnson Trailer Sales properly perfected their security interest in the mobile home by filing a financing statement in the Probate Office, Sumter County, Alabama—the debtor's home county. Johnson Trailer Sales assigned the sales contract and security interest to First Southern Federal Savings & Loan Association of Mobile, Alabama (hereinafter "First Southern").

(2) Debtor moved the mobile home to his real property, consisting of two lots, in York, Alabama. Debtor placed the mobile home on one of the lots, removed the wheels, and underpinned the mobile home. Plumbing facilities were attached to the mobile home. The mobile home was listed for ad valorem tax purposes as real estate.

(3) On May 7, 1981, debtor obtained a loan from Transamerica Financial Services, Inc. (hereinafter "Transamerica") in the amount of $9,462.79 plus finance charges of $5,697.21 or a total of $15,360.00 with an APR of 21%. The repayment period was 60

months (5 years). As security for this loan Transamerica took a mortgage on the two lots and mobile home owned by the debtor.

(4) Max Brown, manager of Transamerica's office in Demopolis, Alabama, testified that when applying for the loan the debtor insisted that the mobile home was really a house and not a mobile home. The debtor listed the mobile home as a house in the credit application made to Transamerica.

(5) On November 10, 1982, debtor filed a Chapter 13 petition with this court.

(6) On December 15, 1982, Transamerica filed a claim in debtor's case for $14,716.56, said sum representing the principal amount of $12,980.64 and $1,735.92 as the present value of five months arrearage calculated to pay out in 3 years. Transamerica is secured by a real estate mortgage on 2 lots owned by the debtor.

(8) On December 17, 1982, the debtor's plan proposing to pay 100% of all secured and unsecured claims was confirmed. Transamerica's claim was excluded and the plan provided for direct payments by Debtor to Transamerica. Transamerica objected to the confirmation and to any reduction of Transamerica's monthly contract payment from $256 per month during the plan—Transamerica insisting that there could be no reduction by even $1.00 of their monthly contract payment of $256 per month. A separate hearing was held upon the modification of the confirmed plan so as to include a reduced monthly payment to Transamerica.

The issues to be determined are:

I. Whether the mobile home was real or personal property under applicable state law.

II. Whether any reduction in the rate of repayment, pursuant to the prepetition contract between Transamerica and the debtor, is prohibited by § 1322(b)(2) of the Code as a modification of the contract.

## CONCLUSIONS OF LAW

### I. WHETHER REAL OR PERSONAL PROPERTY

In order to utilize § 1322(b)(2) Transamerica, claiming to hold a security interest only in debtor's real property, argues that the mobile home is real property that is the debtor's principal residence. In determining whether the mobile home is real or personal property the Court must look to the applicable state law, in this case Alabama law. See *In re Colver,* 7 B.C.D. 859 (Bkrtcy.D. Nevada 1981); 5 Collier on Bankruptcy ¶ 1322.01(3)(B)(i)(a) at 1322–8 through 1322–9 (15th ed. 1982).

■ Alabama courts have held that a fixture is " 'an article which was once a chattel, but which, by being physically annexed or affixed to the realty, has become accessory to it and part and parcel of it.' " *Milford v. Tennessee River Pulp & Paper Company,* 355 So.2d 687, 689–690 (Ala.1978) [quoting *Farmers & Merchants Bank v. Sawyer,* 26 Ala.App. 520, 522, 163 So. 657, 658 (1935)]. Criteria used to determine whether an article has become a fixture are: "(1) Actual annexation to the realty or to something appurtenant thereto; (2) Appropriateness to the use or purposes of that part of the realty with which it is connected; (3) The intention of the party making annexation or making permanent attachment to the freehold. This intention of the party making the annexation is inferred; (a) From the nature of the articles annexed; (b) The relation of the party making the annexation; (c) The structure and mode of annexation; (d) The purposes and uses for which the annexation has been made." *Milford v. Tennessee River Pulp & Paper Company,* supra, at 690 [quoting *Langston v. State,* 96 Ala. 44, 46, 11 So. 334, 335 (1891)].

■ In the case at bar, these three requirements have been met. The mobile home was set on the lot and underpinned (foundation built). Water and plumbing lines were affixed to the mobile home. The use was certainly appropriate as this property and the surrounding neighborhood is largely residential in nature. Intent to affix property to the realty is presumed when a structure or building is voluntarily erected. See *Milford v. Tennessee River Pulp &*

*Paper Company*, supra. Here the debtor voluntarily moved the mobile home onto his lot, removed the wheels, attached plumbing lines and placed a foundation under it. The debtor listed the mobile home as his house in his credit application to Transamerica and for real property tax purposes listed and claimed a homestead exemption in the mobile home and lot. Debtor executed a mortgage on the mobile home and lots when he procured the loan from Transamerica. The debtor intended to make this his permanent home. These actions evidence an intent on the part of the debtor to permanently affix the mobile home to the realty such that it did become a part of the realty.

■ It should also be noted that First Southern (as assignee of Johnson Trailer Sales) properly perfected its security interest before the mobile home became a fixture and, as such, its lien has priority over any interest acquired by Transamerica as real estate mortgagee of the property to which the mobile home became affixed. See *Coffee County Bank v. Hughes*, 423 So.2d 831, 833–34 (Ala.1982) [analysis of Ala.Code § 7–9–313(2) ].

## II. APPLICABILITY OF SECTION 1322(b)(2)

Section 1322(b)(2) of the Bankruptcy Code provides: "Subject to subsections (a) and (c) of this section, the plan may—(2) modify the rights of secured claims, other than a claim secured *only* by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims..." (Underlining and italics for emphasis). Transamerica contends that its contracted monthly payment of $256 cannot be changed or reduced as they have a security interest (mortgage) only in real property that is the debtor's principal residence. Transamerica's objection to confirmation and any change of its contractual monthly payment of $256 per month based on § 1322(b)(2) is not well taken based upon four separate theories: (A) the basic purpose of § 1322(b)(2) is to protect long term institutional first mortgages; (B) a reduc-

tion in the contract monthly payment is not a prohibited modification; (C) secured creditor's claim is not secured ONLY by principal residence; and (D) the secured creditor (Transamerica) is undersecured under § 506(a).

### A. BASIC PURPOSE TO PROTECT LONG–TERM FIRST MORTGAGES

■ Prior to the enactment of § 1322(b)(2), finance companies, such as Transamerica, took security interests in a variety of household goods as well as a second, third or fourth mortgage on real estate of the debtor. Now the trend among nationwide finance companies is to take a mortgage *only* on the real property that is the debtor's principal residence in an attempt to come within the exception provided by § 1322(b)(2) which would prevent the Chapter 13 plan from modifying their rights. This Court believes that these short-term, non-home related, finance company loans are not within the Congressional intended scope of § 1322(b)(2).

The legislative history surrounding the final enactment of § 1322(b)(2) is obscure at best. See *In re Neal*, 10 B.R. 535 (Bkrtcy.S.D.Ohio 1981) [very good review of the evolution of § 1322(b)(2) ]. It is apparent, however, that Congress intended that other Chapter 13 provisions must be read in para materia with § 1322(b)(2), particularly § 1322(b)(5).

Section 1322(b)(5) provides: "notwithstanding paragraph (2) of this subsection, [the plan may] provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured or secured claim on which the last payment is due after the date on which the final payment under the plan is due..." (underlining for emphasis). Since the length of a Chapter 13 plan ranges from 3 to 5 years (see § 1322(c)), it is equally apparent that Congress intended § 1322(b)(5) to apply to long-term debt, such as the usual FHA, VA or other institutional first mortgage. The typical finance company or "aluminum siding" consumer loan is repayable in a much shorter term

(e.g. 24–60 months) and is not within the intended purview of § 1322(b)(5).[1]

"Section 1322(b)(2) of the House amendment represents a compromise agreement between similar provisions in the House bill and Senate amendment. Under the House amendment, the plan may modify the rights of holders of <u>se-cured claims other than a claim secured by a security interest in real property that is the debtor's principal residence. It is intended that a claim secured by the debtor's principal residence may be treat-ed with under Section 1322(b)(5) of the House amendment.</u>" (Underlining for emphasis.) 124 Cong.Rec.H. 11, 106 (Sept. 28, 1978); S. 17,423 (Oct. 6, 1978).

The last sentence in this Congressional report infers that the exception provided by § 1322(b)(2) for a claim secured by the debtor's principal residence is the type of claim that may be treated with under § 1322(b)(5)—a long-term mortgage debt and not a short-term finance company 2nd or 3rd mortgage. In construing the exception provided in § 1322(b)(2) the Bankruptcy Court for the Northern District of Florida reached a similar conclusion. "Although the legislative history is silent, the plain intent of the exception is to provide stability in the residential long-term home financing industry and market. It is to specifically protect institutional lenders engaged only in providing long-term home mortgage financing and not lenders primarily engaged in consumer or other areas of financing but who take security interests in a residence or homestead to secure non-home financing debts." *United Companies Financial Corporation v. Brantley,* 6 B.R. 178, 189

(Bkrtcy.N.D.Fla.1980). Contra, *In re Simpkins,* 16 B.R. 956, 972 (Bkrtcy.E.D.Tenn. 1982). Although the statute is not limited to lenders engaged only in home financing it is intended to specifically apply to actual, long-term home financing loans, regardless of the lender.[2] In applying the exception in § 1322(b)(2) the distinction is not based on the type of lenders but rather on the type of loan. This court believes that this exception is inapplicable to relatively short-term, non-home related loans secured only by a security interest in the debtor's principal residence.[3] In the instant case, Transamerica's loan was relatively short term (60 months) with a high rate of interest (21% APR). Therefore their claim does not fall within the exception provided in § 1322(b)(2) and is subject to repayment modification.

## B. REDUCTION IN CONTRACT MONTHLY PAYMENT IS NOT PROHIBITED MODIFICATION.

In construing § 1322(b)(2) the court should also consider § 1325(a)(5)(B), the "cram down" provision for secured creditors in Chapter 13. This provision provides that non-assenting holders of secured claims will retain their liens and be paid the full value of their collateral as of the date of petition, with an appropriate discount factor for deferred payment over time. This is all that § 1325(a)(5)(B) requires for treatment of secured creditors. Notwithstanding § 1322(b)(2), this court feels that a residential mortgagee is not entitled to any greater treatment. In the present case, a change in the repayment amount provided in the pre-

---

**1.** A default under such a short-term loan would be curable under § 1322(b)(3). See *In re Taddeo,* 685 F.2d 24 at 27 (2nd Cir.1982).

**2.** "In enacting Sections 1322(b)(2) and 1322(b)(5) of the Code, Congress apparently intended to provide stability in the long-term residential housing market, taking both the interests of homeowners and their financiers into account. Unfortunately, this policy lies hidden in the statutory language of Sections 1322(b)(2) and 1322(b)(5) and only surfaces after an examination of the legislative histories behind the subsections. Congress might have more clearly expressed what it intended to achieve in

enacting the subsections by drafting Section 1322(b)(2) as follows:

(b) ... the plan may—

    .    .    .    .    .

(2) modify the rights of holders of secured claims, other than a claim secured by a long-term residential mortgage, or of holders of unsecured claims." Comment, 1982 Ann.Surv. Bankr.L. 493 at 510.

**3.** This also seems to be the interpretation intended by the Court in *United Companies Financial Corp. v. Brantley,* supra.

petition contract does not "modify" a § 1322(b)(2) residential secured creditor where that secured creditor receives the full value of its secured claim as required by § 1325(a)(5)(B). In a similar case, *In re Neal,* 10 B.R. 535 (Bkrtcy.S.D.Ohio 1981), the court determined the relationship between § 1322(b)(2) and § 1325(a)(5). "In the final analysis, this Court finds in this case that the provisions of § 1322(b)(2) of the Bankruptcy Code do not argument the rights of FMCC as a secured creditor, as those rights are embodied in § 1325(a)(5) of the Bankruptcy Code. The confirmation standards applicable in this case have thus been fully satisfied, and FMCC is being treated fairly and in concert with the protection afforded it by the statute." at 541. See also *In re Paige,* 13 B.R. 713 (Bkrtcy.S. D.Ohio 1981).

### C. SECURED CREDITORS CLAIM IS NOT SECURED ONLY BY PRINCIPAL RESIDENCE

(Secured also by adjoining vacant lot).

In addition, without considering the foregoing arguments, upon examination of the § 1322(b)(2) exception it is evident that Transamerica fails to satisfy the requirements of that exception. In light of the previous discussion on the Alabama law of fixtures, it is clear that Transamerica does have a security interest in real property that is the debtor's principal residence. However, to fall within this exception preventing modification of a secured creditor's claim, the claim must be secured only by a security interest in real property that is the debtor's principal residence (underlining for emphasis). "A claim secured by any other real property or by personal property of the estate or of the debtor, or by property of another may be modified by the Chapter 13 plan." 5 Collier on Bankruptcy ¶ 1322.-01(3)(B)(i)(a), at 1322—8 (15th ed. 1982). See also Lee, Chapter 13 nee Chapter XIII, 53 Am.Bankr.L.J. 303, 314 (1979). In this case Transamerica holds a mortgage on two lots owned by the debtor. The mobile home owned by the debtor is affixed to only one of these lots, with the other lot being vacant. Thus the debtor's principal residence

consists of the mobile home and its underlying lot. Consequently, Transamerica is secured by real property of the debtor other than the real property that constitutes the debtor's principal residence. Therefore, Transamerica does not fall within the exception provided by § 1322(b)(2) and the debtor's plan may provide for reducing the contractual rate of payment on Transamerica's claim.

### D. THE CREDITOR (TRANSAMERICA) IS UNDERSECURED UNDER § 506(a).

First Southern has a valid first lien on the mobile home which was perfected before it was attached to the realty. Transamerica has a valid second lien on the mobile home and a valid first lien on the two lots. Transamerica's testimony indicated that the value of their entire collateral was $37,000. Debtors testified that they were trying to sell and were asking $30,000. First Southern filed a claim for $22,153.87 and Transamerica for $14,716.56, totaling $36,070.43. If the property were sold, the cost of sale (estimated 5 to 10%) would decrease the net recovery so that Transamerica would be in fact undersecured within § 506(a). In a forced sale situation (either in a state foreclosure sale or Chapter 7 liquidation), Transamerica would likely be substantially more undersecured. Consequently, the Court finds that Transamerica is in fact an undersecured creditor within § 506(a), and thus unable to invoke the protection of § 1322(b)(2). See *In re Neal,* 10 B.R. 535, 537 (Bkrtcy.S.D.Ohio, 1981).

### CONCLUSION

The purpose of Chapter 13 is to provide an overburdened debtor with a framework wherein the debtor can attempt financial rehabilitation. Central to the viability of a Chapter 13 rehabilitation is the ability of the debtor to propose a workable plan. Therefore, in this case the court finds that Transamerica's objection to confirmation and a reduction of its contract monthly rate is without merit and is hereby overruled.

This shall constitute the findings of fact and conclusions of law pursuant to Rule 752 of the Rules of Bankruptcy Procedure. A separate modified confirmation order will be entered consistent with this opinion.