COMMONWEALTH OF
PENNSYLVANIA,
Petitioner,

v.

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, Respondent.

No. 82–3547.

United States Court of Appeals,
Third Circuit.

Argued Sept. 14, 1983.

Decided Dec. 21, 1983.

Rehearing and Rehearing En Banc
Denied Feb. 15, 1984.

Stanley Slipakoff (argued), Asst. Counsel, Chief of Litigation, Southeast Field Office, Dept. of Public Welfare, Philadelphia, Pa., for petitioner.

Diane C. Moskal, Regional Atty., James S. Feight, Jr., Asst. Regional Atty., Javier Arrastia (argued), Dept. of Health and Human Services, Philadelphia, Pa., for respondent.

---

Before WEIS, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The Commonwealth of Pennsylvania appeals from a decision by the Department of Health and Human Services (HHS) denying reimbursement for funds that the Commonwealth expended under the Medicaid program for abortions performed immediately after the Hyde amendment took effect. We must resolve two major issues: first, whether this court has jurisdiction to review directly the decision of the Secretary, and second, whether the Hyde amendment should be interpreted as requiring the state to pay the entire share of abortions performed while Medicaid recipients were being notified of the reduction in benefits. We conclude that we do have jurisdiction and that the federal government is obligated to continue paying its share for abortions during the reasonable time needed to provide the required notice.

## I.

### Facts and Procedural History

Under the Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., each participating state administers a program financed jointly by the state and federal government to pay medical expenses for the needy. The federal matching funds are conditioned on the state's compliance with federal requirements. HHS advances funds to the state quarterly on the basis of estimated expenditures, and this sum is adjusted when, at the end of the quarter, the state reports its actual expenses. See 42 U.S.C.A. § 1396b (1974 & West Supp. 1975–1982); 45 C.F.R. § 201.5.

The administration of this system was complicated, at least from the Common-

wealth's point of view, by the enactment of the Hyde amendment withdrawing federal funding for almost all abortions.[1] Funds remained available to the states while the Hyde amendment was challenged in the courts. In *McRae v. Califano,* 491 F.Supp. 630 (E.D.N.Y.1980), implementation of the Hyde amendment was enjoined. On June 30, 1980, the Supreme Court reversed. *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784. The injunction remained in effect, however, while plaintiffs' petition for rehearing was pending.

In the meantime, Pennsylvania, like other participating states, received notice from HHS that (1) it was uncertain when the amendment would become effective; (2) funding for medically necessary abortions would continue until that time; (3) states were not obligated to finance those abortions for which federal funds would not be available; and (4) the states were bound by 42 C.F.R. § 431.211 to give Medicaid recipients ten days' notice before cutting benefits, even if federal funds were cut off before the ten-day period ended. Further, the agency said that because it did not expect advance notice of the date that the Supreme Court's decision would become effective, Pennsylvania would be informed of that event by telephone. The Supreme Court denied rehearing, and the decision became effective on September 19, 1980 when the district court vacated its injunction.

On October 3, 1980, HHS notified the Pennsylvania Department of Public Welfare (DPW) that the reduction in funds had taken effect and that the version of the Hyde amendment included in the Joint Resolution of October 1, 1980 was more restrictive in its funding of abortions than the earlier version. This mailgram also reminded the Commonwealth of the ten-day notice requirement. It is the Commonwealth's po-

---

1. The Hyde amendment has been enacted as a joint resolution or a rider to the Department's appropriations bill each year since 1976. The versions at issue here are Pub.L. No. 96–86, § 118, 93 Stat. 656, 662 (Oct. 12, 1979); Pub.L. No. 96–123, § 109, 93 Stat. 923, 926 (Nov. 20,

1979); Pub.L. No. 96–369, § 110, 94 Stat. 1351, 1356 (Oct. 1, 1980). Variations in the specific provisions are not directly relevant here, and we use the term "Hyde amendment" to refer to any and all versions.

sition that it needed to draft, translate into Spanish, and print a notice to be included with DPW's regular October mailing to Medicaid recipients; that this mailing could not be completed until the end of October, and that it could therefore not reduce the recipients' abortion benefits until November 10.[2]

The Commonwealth subsequently submitted claims to the Secretary for reimbursement for abortions performed between September 19 and November 10 that were medically necessary but not in the categories for which the Hyde amendment authorized reimbursement. The claim, for a total of $166,924, was disallowed. The Commonwealth appealed to the departmental Grant Appeals Board, which upheld the Secretary's decision. The Board's conclusion, and HHS' contention here, is that as of September 19, 1980, the Hyde amendment terminated HHS' authority to disburse funds for the abortions at issue. Before we can reach the merits of Pennsylvania's appeal, we must first consider HHS' motion to dismiss the appeal on the ground that there is no direct court of appeals review of the Secretary's determination.

## II.

### *Jurisdiction*

■ There are two distinct tracks for review of disputes regarding reimbursement for state programs; the appropriate track will depend on the nature of the dispute. Under 42 U.S.C. § 1316(a) (1976 & Supp. V 1982), there is direct review in the court of appeals following the Secretary's initial determination and administrative re-

consideration for disputes which are considered "compliance" or "plan-conformity" disputes.[3] Such disputes include whether the state's plan meets the applicable federal requirements for initial approval and whether the Secretary may properly withhold or limit payments on a finding

(1) that the plan has been so changed that it no longer complies with the provisions of § 1396a of this title; or

(2) that in the administration of the plan there is a failure to comply substantially with any such provision;

42 U.S.C. § 1396c (1976).

In contrast, section 1316(d), 42 U.S.C. § 1316(d) (Supp. V 1982), applies when the issue concerns the Secretary's determination "that any item or class of items on account of which Federal financial participation is claimed . . . shall be disallowed for such participation." The section does not explicitly provide for judicial review, but the Secretary has conceded here, as in earlier cases before this court, that there is review by a district court.[4] Transcript of Argument Sept. 14, 1983 at 15.

Thus, the question before us is whether HHS' denial of funds to Pennsylvania constitutes a finding of noncompliance, reviewable under section 1316(a), or a disallowance, governed by section 1316(d). That question is complicated by the fact that the term "disallowance" is not defined in the statute or in the regulations. As is frequently the case, the dispute does not fit neatly into any usual classification. The distinctions "involve differences in degree rather than kind." *See Massachusetts v.*

---

2. In fact, DPW did not mail its notices until the November, 1980 mailing and it did not seek to reduce abortion coverage until some time in December, 1980. DPW recognizes that "with greater speed on its part, it might have been ready to reduce coverage on November 10, 1980," Brief for Petitioner at 5, and seeks recovery from HHS only until the earlier date.

3. The relevant provision is:

Any State which is dissatisfied with . . . a final determination of the Secretary under section . . . 1396c of this title may . . . file

with the United States court of appeals for the circuit in which such State is located a petition for review of such determination. 42 U.S.C. § 1316(a)(3) (Supp. V 1982).

4. *See New Jersey v. Department of Health and Human Services,* 670 F.2d 1262, 1271 & n. 8 (3d Cir.1981); *New Jersey v. Department of Health and Human Services,* 670 F.2d 1284, 1290 n. 11 (3d Cir.1981), *cert. denied,* 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982); *New Jersey v. Department of Health and Human Services,* 670 F.2d 1300, 1304 n. 8 (3d Cir.1982).

*Departmental Grant Appeals Board,* 698 F.2d 22, 27 (1st Cir.1983).

The meaning, applicability, and interrelationship of section 1316(a) plan-conformity review and section 1316(d) disallowance review was discussed in detail in *New Jersey v. Department of Health and Human Services,* 670 F.2d 1262, 1268–77 (3d Cir.1981) (*New Jersey I*). See also *New Jersey v. Department of Health and Human Services,* 670 F.2d 1284, 1290–92 (3d Cir.), *cert. denied,* 459 U.S. 824, 103 S.Ct. 56, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982) (*New Jersey II*), and *New Jersey v. Department of Health and Human Services,* 670 F.2d 1300 (3d Cir.1982) (*New Jersey III*). There, guided by decisions of the Fifth Circuit, we made the following general observations:

> [P]lan-conformity disagreements, by their very nature, concern either the validity of a state's plan as a whole or its overall administration. Disallowance disputes, however, are far more narrowly focused: they generally arise "in connection with a routine audit" and involve "the accuracy of [that] audit."

*New Jersey I,* 670 F.2d at 1271 (quoting *Medical Services Administration v. United States,* 590 F.2d 135, 136 (5th Cir.1979)). See also *Texas Department of Public Welfare v. Califano,* 556 F.2d 326, 331–32 (5th Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 78, 58 L.Ed.2d 108 (1978) (hereafter *Texas DPW*).

In *New Jersey I,* we categorized as a "compliance" issue over which we had direct jurisdiction a dispute as to whether HHS could properly deny reimbursement to New Jersey for child-support services which the state had provided to non-welfare recipients who had not provided applications as required by HHS regulations. *New Jersey III,* by contrast, presented what we labeled

"an almost archetypical section 1316(d) situation." 670 F.2d at 1303. The issue there was whether an official's handwritten notation approving a nursing home constituted proper certification for Medicaid purposes. We determined that the case was easily categorized as a disallowance because it involved a single provider and did not affect any other aspect of the state's plan.[5]

HHS argues, not implausibly, that this is not a compliance dispute because it does not concern the validity of Pennsylvania's state plan, either on its face or in its administration, and because the determination at issue was not based on a finding of plan nonconformity. This argument, however, is similar to that previously made by HHS and rejected by this court in our recent consideration of this issue.

The dispute before us is closely analogous to that presented in *New Jersey I,* and both the reasoning and language used there are apt here.[6] As there, "HHS ... argues that this case simply entails the disallowance of discrete expenditures for which [the state] erroneously sought reimbursement, rather than the question whether the State's plan, as a whole, conforms to applicable national requirements." 670 F.2d at 1268–69. In this case, as there, "[t]he agency did not conclude that [the state's] plan, which has been in effect for many years, was somehow not in compliance with federal statutes and regulations; nor did the Secretary determine that the State, while purporting to operate under a previously approved plan, had substantially deviated from it in practice." *Id.* at 1272. In this case, as there, "[a]t no time during the administrative proceedings to date ... did HHS employ the plan conformity-related provisions ... *e.g.,*

---

5. *New Jersey II* involved the state's attempt to amend its Medicaid plan retroactively to bring certain aged, institutionalized persons into the program after determining that the group was eligible. HHS "disallowed" the claims. Using the reasoning of *New Jersey I,* we designated the dispute compliance-related, and referred to "the complicated legal nature and procedural history of this dispute." 670 F.2d at 1292.

6. Other circuits have taken divergent approaches to the jurisdictional issue, *see, e.g., Georgia Department of Medical Assistance v. Department of Health and Human Services,* 708 F.2d 627, 629–30 (11th Cir.1983); *Illinois v. Schweiker,* 707 F.2d 273, 279 (7th Cir.1983), but we are bound to the statutory interpretation which this court enunciated in the *New Jersey* trilogy.

no compliance hearing was conducted by the agency in this matter." *Id.*[7]

As in *New Jersey I,* "HHS does not contend that the present controversy arose because the State made a 'clerical' mistake with respect to computation of the amount of services to be provided [recipients]; nor does the Department "assert that the State sought too much · . . . reimbursement from the federal government due to the employment of an erroneous formula." 670 F.2d at 1275 (citations omitted). "It cannot be said, moreover, that the 'disallowances' imposed here originated 'in connection with a routine audit of specific claims submitted by the state to [HHS] for reimbursement.'" *Id.* (quoting *Medical Services Administration,* 590 F.2d at 136).

Here, as in *New Jersey I* and in *Texas DPW,* upon which we relied, HHS' "reasons for denying the . . . claim amount to a finding of nonconformity with . . . federal requirements." *Id.* at 1275 (quoting *Texas DPW,* 556 F.2d at 330–31). In *New Jersey I,* HHS denied funds to New Jersey "because, from the agency's perspective, the State failed to abide by an explicit requirement upon which the receipt of federal funds was conditioned". *Id.* Here, as in the earlier cases, HHS behaved "as if it had determined that the claims presented by [the state] were 'not proper and allowable under . . . the law and regulations.'" *Id.* (quoting *Texas DPW,* 556 F.2d at 331). As did *New Jersey I,* this case raises "difficult and significant legal issues" involving the construction of the Social Security Act, the interpretation of the amendment at issue, and the legality of certain actions by HHS. *Id.* at 1273, 1278; *see also New Jersey II,* 670 F.2d at 1292. This dispute concerns Pennsylvania's challenge to HHS' interpretation of the operation of the Hyde amendment, an issue which could also arise with other potential cutbacks of federal programs, rather than specific irregularities in the Commonwealth's claims.

We are persuaded that such concerns for federal-state cooperation and allocation of costs led Congress to provide initial court of appeals review of compliance related matters. We also believe "[t]here is . . . little to be gained by dismissing these petitions for lack of jurisdiction, thereby delaying consideration by this Court of the underlying merits until, many months from now, an appeal can be brought from a final determination of a district court." *New Jersey I,* 670 F.2d at 1276. The dispute is, after all, exclusively a legal one. The limited legislative history confirms that section 1316(a) review should be available to resolve disputes over whether a federal agency action is consistent with the intent of the federal statute. *See* 111 Cong.Rec. 3067–68 (1965) (remarks of Sen. Javits). That is the crux of the dispute here. We thus conclude that section 1316(a) confers jurisdiction upon us to resolve it, and will deny the motion to dismiss the appeal.

### III.

#### *Funding During the Notice Period*

Turning then to the merits, we must decide whether the Grant Appeals Board erred in interpreting the Hyde amendment to require termination of federal funds for abortions before notice had been sent to recipients. The version of the Hyde amendment that took effect when the injunction was vacated provided that "none of the funds provided by this joint resolution shall be used to perform abortions except. . . ." Pub.L. No. 96–123, § 109, 93 Stat. 923 at 926 (1979). It does not differ materially from the subsequent version, *see* Pub.L. No. 96–369, 94 Stat. 1351, 1356 (1980). It is without question that by the amendment, Congress intended to restrict federal funding of abortions. It does not follow, however, as HHS argues and the Board concluded, that HHS had no authority after September 19, 1980 to disburse any funds for non-Hyde abortions.

---

7. HHS argues that there is no conformity issue here because the Supreme Court in *McRae,* 448 U.S. at 311 n. 16, 100 S.Ct. at 2685 n. 16, stated that a state plan is not required to cover abortion services for which there is no federal match. This, however, circumvents the jurisdictional issue.

Whether the Hyde amendment in fact ended the agency's power to finance abortions during the notice period depends, of course, on when Congress intended the restriction to take effect. The legislative history does not address that question. While the Grant Appeals Board noted that Congress "could have had a delayed effective date or otherwise provided to allow for [federal funds] during a notice period, but did not," it is also true that Congress could have provided explicitly that the funds be cut immediately, but did not. Because the amendment is ambiguous in this regard, our inquiry begins with general principles of statutory construction.

■ One such principle is that statutory provisions enacted at different times should be read as harmoniously as possible, so that each is given effect and the provisions do not conflict. *E.g., Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974); *Clark v. Uebersee Finanz-Korp.,* 332 U.S. 480, 488, 68 S.Ct. 174, 177–178, 92 L.Ed. 88 (1947); *Republic Steel Corp. v. Costle,* 581 F.2d 1228, 1232 (6th Cir.1978); 1A C. Sands, Statutes and Statutory Construction, A Revision of the Third Edition of Sutherland Statutory Construction §§ 22.34, 22.35 (4th ed. 1972 & Supp.1983).

■ We must reconcile not two but three provisions: the Hyde amendment, the notice rule, and the general provision of 42 U.S.C. § 1396b(a)(1) that commits the federal government to pay a percentage of medical expenses for the needy. HHS concedes that DPW was not able to ignore the requirement in 42 C.F.R. § 431.211 of ten days' notice to Medicaid recipients of a reduction in benefits. We have held that the state is bound by the Title XIX notice regulations, even when the part of the program at issue has been adjudged to be in violation of federal standards. *Eder v. Beal,* 609 F.2d 695, 699–700 (3d Cir.1979); *see also Rochester v. Baganz,* 479 F.2d 603, 606 (3d Cir.1973). Significantly, HHS reminded the states that the notice requirement remained in effect.

If the notice rule and the Hyde amendment as construed by HHS were both given effect, the federal government would be abrogating its statutory and contractual commitment to the states. In *Harris v. McRae,* the Supreme Court stated that it would be inconsistent with the federal government's statutory undertaking to finance the Medicaid program to require the states to continue financing any abortions for which federal funds had been withdrawn. 448 U.S. at 308–09, 100 S.Ct. at 2683–2684. Title XIX is "not ... a device for the Federal Government to compel a State to provide services that Congress itself is unwilling to fund." *Id.* at 309, 100 S.Ct. at 2684.

> Nothing in Title XIX as originally enacted, or in its legislative history, suggests that Congress intended to require a participating State to assume the full costs of providing any health services in its Medicaid plan. Quite the contrary, the purpose of Congress in enacting Title XIX was to provide federal financial assistance for all legitimate state expenditures under an approved Medicaid plan.
>
> ... Thus, if Congress chooses to withdraw federal funding for a particular service, a State is not obligated to continue to pay for that service as a condition of continued federal financial support of other services.

448 U.S. at 308–09, 100 S.Ct. at 2684.

Congress ratified that interpretation when, after *McRae,* it re-enacted the Hyde amendment and added the provision that "the several states are and shall remain free not to fund abortions to the extent that they in their sole discretion deem appropriate." Pub.L. No. 96–369, § 110, 94 Stat. 1351, 1356 (October 1, 1980). It follows that neither the statute nor the Hyde amendment should be construed to impose upon the states the entire and unreimbursed costs of abortions during the period when the state was required to give notice of the termination of abortion funding.

Moreover, in *McRae* the Court emphasized its interpretation of Medicaid as a system of "cooperative federalism," 448 U.S. at 308, 100 S.Ct. at 2683, in which the

state and federal governments exchange promises. It stated,

> [I]f a State agrees to establish a Medicaid plan that satisfies the requirements of Title XIX, which include several mandatory categories of health services, the Federal Government agrees to pay a specified percentage of "the total amount expended . . . as medical assistance under the state plan. . . ." 42 U.S.C. § 1396b(a)(1). The cornerstone of Medicaid is financial contribution by both the Federal Government and the participating State.

*Id.* at 308, 100 S.Ct. at 2683. A similar federal-state grant program, the Developmentally Disabled Assistance and Bill of Rights Act of 1975 (codified as amended at 42 U.S.C. § 6000 et seq., 1976 & Supp. V 1981), was described in *Pennhurst State School and Hospital v. Halderman* as an arrangement "much in the nature of a contract." 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981). The Court explained, "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' . . . Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* (citations and footnote omitted).

Thus guided, we agree with Pennsylvania's contention that the directive of the Hyde amendment must be construed on terms consistent with the federal government's obligations both to the states and the Medicaid beneficiaries under Title XIX. It would be anomalous to attribute to Congress an intent to abrogate its agreement to share costs during the short notice period for implementation of termination of a service.[8]

The notice period itself must not exceed a reasonable time. The Commonwealth maintains that in the circumstances of this case a notice period lasting through November 10, 1980 is reasonable. *See supra* note 2. First, the Commonwealth argues it could not have drafted a valid notice before October 3, 1980, for it was only then that HHS disclosed which abortions the newly re-enacted Hyde amendment would cover. It would have been futile to send earlier notices based on the old version which was scheduled to lapse on October 1, just a little more than ten days after the injunction was vacated. Further, the Commonwealth argues that it needed time after October 3 for careful drafting, translation and printing of a notice to be included with the regular October mailing. What constituted a reasonable notice period is a factual issue which the Board did not reach, and which we believe it should address in the first instance.

For the foregoing reasons, we will grant the petition for review and remand this case to the Board for a finding on that issue.

---

**8.** In light of our construction of the Hyde amendment we express no opinion on Congress' power to withdraw funding for a Medicaid service before a reasonable period for notice has expired. In this regard we note that Pennsylvania contends that recipients have a property right in receipt of continuing benefits which cannot be taken away without prior notice. Brief for Commonwealth at 13 n. 4. *See also Eder v. Beal,* 609 F.2d at 699–700 n. 9.