## In re Darlette CASTER, Debtor.

### Darlette CASTER, Plaintiff,

### v.

### UNITED STATES of America, Secretary of Housing and Urban Development, Defendant.

**Bankruptcy No. 86–03889G.**
**Adv. No. 87–0282S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 24, 1987.

Philip A. Bertocci, Community Legal Services, Inc., Philadelphia, Pa., for debtor.

Virginia R. Powel, Asst. U.S. Atty., Philadelphia, Pa., for defendant.

Edward Sparkman, Philadelphia, Pa., Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A.  INTRODUCTION

Before us is another in the parade of cases challenging the validity of a secured claim of a mortgagee with the double-edged sword of 11 U.S.C. § 506(a) and the federal Truth-in-Lending Act, 15 U.S.C. § 1601, et seq. (hereinafter referred to as "TILA"). One unique element is the Defendant: none other than the United States of America, on behalf of the Secretary of Housing and Urban Development (hereinafter referred to as "HUD"). The identity of the Defendant blunts the TILA claim but, despite a valiant effort by the Defendant to convince us to forsake our own recent precedents and find that 11 U.S.C. § 1322(b)(2) precludes the § 506(a) claim, we reject same. We conclude that the Debtor can reduce the Defendant's secured claim to the amount of the fair market value of the Debtor's home. In resolving the shoot-out between the inevitable "dueling appraisers," we give the Defendant's expert the slight nod and value the premis-

es, and hence the value of its secured claim, at $13,000.00.

The opponent of her country in this proceeding is an indigent single parent of four children, aged from ten years to a new born baby, i.e., the Debtor, DARLETTE CASTER. The Debtor commenced her Chapter 13 bankruptcy case on August 18, 1986, and filed this Adversary proceeding on March 24, 1987. At issue for the Debtor in this case is retention of her home, situated at 6128 Upland Street, Philadelphia, Pennsylvania 19142 (hereinafter referred to as "the home").

The trial of this proceeding took place on June 30, 1987. We allowed the parties until July 31, 1987, and August 17, 1987, to file their Briefs, and they proceeded to do so in timely fashion.

Many of the facts are undisputed. However, because we must make a factual determination as to the value of the Debtor's home and as to whether the Debtor received a TILA disclosure statement, and technically Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a) requires us to do so, we shall present our decision in the classic format of Findings of Fact, Conclusions of Law, and a Discussion.

B. FINDINGS OF FACT

1. The Debtor executed a mortgage on January 29, 1981, in the amount of $11,500.00, insured by HUD's Federal Housing Administration (hereinafter referred to as "FHA"), whereby she purchased the home.

2. The mortgage recites that security is taken in the property of the Debtor, *inter alia*, as follows:

TOGETHER with all and singular the Buildings and Improvements on said premises, as well as all alterations, additions or improvements now or hereafter made to said premises, and any and all appliances, machinery, furniture and equipment (whether fixtures or not) of any nature whatsoever now or hereafter installed in or upon said premises, Streets, Alleys, Passages, Ways, Waters, Water Courses, Rights, Liberties, Privileges, Hereditaments and Appurtenances whatsoever thereunto belonging, or in

any wise appertaining, and the Reversions and Remainders, Rents, Issues and Profits thereof.

3. The Debtor testified that, at the time of settlement on her home purchase, she received several papers which she put in a metal box. When she examined the papers at the request of her counsel, she did not turn up a TILA disclosure statement. As a result, the Debtor claims that she did not receive such a disclosure statement.

4. Despite this testimony, we find that the Debtor did receive a disclosure statement. While we do not doubt the subjective honesty of the Debtor's testimony, our observations of her on the witness stand cause us to question the accuracy of her powers of recall, and hence we refuse to base a finding that something that ordinarily is done has not been done on the sole basis of this testimony.

5. After becoming in arrears on the mortgage and unsuccessfully attempting to comply with Forebearance Agreements from almost the onset of the mortgage, the Debtor successfully requested an assignment of her mortgage to HUD, which was effected on September 21, 1982.

6. After the 36–month period in which the Debtor's mortgage payments were reduced in accordance with her income under the HUD assignment program, see 24 C.F.R. § 203.652(a)(6), the Debtor continued to experience difficulties in making payments, and HUD's threats to foreclose were ceased only upon the Debtor's filing bankruptcy.

7. On November 7, 1986, the Defendant filed a secured Proof of Claim in the amount of $19,559.34 in the Debtor's main bankruptcy case.

8. On March 27, 1987, the Defendant filed a Motion for Relief from the Automatic Stay, in response to which the Debtor admitted that, after her 36–month forebearance period expired in 1985, she had made only six payments through March, 1987.

9. Nevertheless, on June 30, 1987, at which time both the Defendant's Motion and the Adversarial proceeding were listed

for trial, the Defendant agreed to withdraw the Stay Relief Motion, without prejudice, pending the outcome of this proceeding, due to the Debtor's commencement of regular payments in recent months.

10. On April 17, 1987, Harry Meyers, a senior residential appraiser who has been employed by HUD, principally in reviewing appraisals, for over twenty-five years, prepared a written appraisal of the home, finding that its fair market value was $15,000.00.

11. On May 18, 1987, Israel Silver, a licensed real estate broker in the vicinity of the Debtor's home for over forty years, prepared a brief written appraisal in which he concluded that the fair market value of the home was $10,000.00.

12. The Debtor, while offering no testimony as to value, testified concerning the condition of the home, which had deteriorated due to her financial ·inability to repair and maintain it. She noted the following defects: a portion of the back wall had pulled away, which she contended rendered the back bedroom uninhabitable; walls, floors, and ceilings were in need of repair; leaks existed in her tub and sink; porch floorboards were missing; there were several leaky windows; and wires were exposed in the hall and one bedroom.

13. We give more weight to the valuation of Mr. Meyers than that of Mr. Silver because Mr. Meyers' written report was more complete and his oral presentation emphasized the good points of the neighborhood, while taking at least some account of the foregoing defects. None of the defects in the home appeared serious except that to the back wall. On the other hand, we cannot totally accept Mr. Meyers' appraisal because he minimized the nature of the defects and he was biased to some degree due to his lengthy employment by HUD. He also lacked Mr. Silver's long experience with the neighborhood, and was somewhat overly impressed by its superficially positive aspects, e.g., convenience to shopping.

14. Weighing the foregoing, we conclude that the fair market value of the home is $13,000.00.

## C. CONCLUSIONS OF LAW

1. Since 15 U.S.C. § 1612 appears to exempt the Defendant from civil liability and the Debtor has failed to prove the existence of any TILA violations, the Debtor's TILA claim must fail.

2. The Defendant's claim, arising from a mortgage providing that the obligee has a security interest in certain personalty of the Debtor-obligor, as well as the home itself, is not "secured *only* by a security interest in real property that is the debtor's principal residence" (emphasis added), and hence is not within the scope of 11 U.S.C. § 1322(b)(2).

3. Assuming *arguendo* that the Defendant's claim were within the scope of 11 U.S.C. § 1322(b)(2), this would not preclude the bifurcation of the Defendant's claim into secured and unsecured portions, per 11 U.S.C. § 506(a).

4. The Debtor therefore may bifurcate the Defendant's claim into a secured claim of $13,000.00, the fair market value of the home, and an unsecured claim of $6,559.34, by operation of 11 U.S.C. § 506(a).

## D. DISCUSSION

The repetition of the parade of cases successfully reducing secured claims of mortgagees to the fair market value of the premises in question on the strength of 11 U.S.C. § 506(a) is broken by the novelty of the challenges to the invocation of this Code provision by Debtors. In this case, the federal government, as mortgagee, boldly confronts the reasoning of this Court at length head-on, and contends that its mortgage, despite including security in such obvious personalty as appliances, is secured only by real estate. Thus, the Defendant opts to butt heads with our decisions in, *e.g.*, *In re Crompton*, 73 B.R. 800, 805–06 (Bankr.E.D.Pa.1987); and *In re Jablonski*, 70 B.R. 381, 385–86 (Bankr.E.D. Pa.1987), where, following a long line of decisions by our honored former Chief Judge, Emil F. Goldhaber, we carefully explained our reasons for concluding why 11 U.S.C. § 1322(b)(2) has no impact on a de-

termination of secured status pursuant to 11 U.S.C. § 506(a). Therefore, at least briefly, we traverse our road of reason again, noting the pitfalls in the by-ways down which the Defendant seeks to send us.

Our beginning point is 11 U.S.C. § 506(a), which provides as follows:

§ 506. Determination of secured status (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the value of such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

The warp and woof of the Defendant's argument is to hypothecize a conflict between that section and 11 U.S.C. § 1322(b)(2), which provides as follows, and to declare this latter Code section as the winner:

§ 1322. Contents of plan (b) Subject to subsections (a) and (c) of this section, the plan may—

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims; ...

■ The first hurdle which the Defendant must overcome is bringing the instant mortgage within the scope of 11 U.S.C. § 1322(b)(2). The weight of this undertaking is heightened by our express holding in *Crompton, supra,* 73 B.R. at 805–06, and *Jablonski, supra,* 70 B.R. at 386, that

mortgages worded almost precisely the same as that in issue here, and hence extending the mortgagee's security interests to non-fixture appliances, as well as other personalty, remove the mortgagee's respective claims from the category of claims secured only by residential realty.

In its Briefs, the Mortgagee raised the following arguments in rebuttal: (1) The inclusion of security in "rents, issues, and profits" is a suggested form recitation by 1 LADNER ON CONVEYANCING IN PENNSYLVANIA, § 9.04, at 8–25 (rev. 4th ed. 1979); and 2 LADNER, *supra,* §§ 12.-08, 12.10, at 12, 19, and hence would exempt "virtually every if not all mortgage transactions in Pennsylvania from the protection of § 1322(b)(2)." Defendant's Trial Memorandum of Law, at 8; (2) "[T]he language in the mortgage document alone" is not "sufficient to create any interest whatsoever in debtor's personalty," Defendant's Reply Brief, at 4, and hence this security is superfluous and should be discounted. Unfortunately for the Defendant, both of these arguments lack merit.

It is, we submit, totally unjust to blame Ladner for the fact that FHA-insured mortgages are written with certain appendages that, from Ladner's perspective, could only work to the mortgagee's benefit. Ladner never claims to take bankruptcy or § 1322(b)(2) into account in his suggestions. Further, no contention can seriously be made that Pennsylvania mortgages must contain these appendages because Ladner suggests it. It can be of no concern to us, on any level, that blind adherence to Ladner has led any given percentage of mortgagees astray in attempting to avoid the impact of § 1322(b)(2).

Furthermore, Ladner never suggests taking security in appliances, as well as fixtures, rents, issues, and profits. Presumably, the mortgagees added this recitation to make just a little bit more from their adhesion-contract advantage.

The Defendant's second point is equally ill-conceived. It begins from a common starting point with the counter-argument of the Debtor: that a mortgage, unless it contains specific recitations causing it to do

so, does not ordinarily effect a security interest in personalty located within the real estate, as opposed to the realty itself and possibly the fixtures thereto. *See Klaus v. Magestic Apartment House Co.,* 250 Pa. 194, 211–13, 219–22, 95 A. 451, 456–57, 458–59 (1915); and *Real Estate Land Title & Trust Co. v. Bankers' Trust Co. of Philadelphia,* 104 Pa.Super. 493, 496–97, 158 A. 634, 635–36 (1932). Both parties apparently agree that the mortgagee may, however, include specific language to effect a valid chattel mortgage in such personalty on the basis of *In re Bollinger Corp.,* 614 F.2d 924, 926 (3d Cir.1980); and *United States v. Ivy Hall Apartments, Inc.,* 197 F.Supp. 678, 681 (E.D.Pa.1961).

However, the Defendant's conclusion that the language in its mortgage creates only an inchoate and hence a less than "real" security interest in the Debtor's personalty definitely does not follow. What the Defendant fails to appreciate is that no security interest is validly perfected at the moment it is taken. What is significant about the taking of any security interest in a contract such as a mortgage is the *potential* that it can be validly perfected, and this is all that can ever be accomplished in the execution of a security agreement such as a mortgage. This point is well-expressed as to the taking of a security interest in personalty in a mortgage in the context of assessing an alleged TILA violation by our aforementioned predecessor, Judge Goldhaber, in *In re Cervantes,* 67 B.R. 816, 819 (Bankr.E.D.Pa.1986):

The defendant contends that it has no security interest in the plaintiffs' personal property because it never filed a financing statement. Hence, defendant argues that, because the recording of a mortgage creates a lien against real property only, no lien against the debtors' personal property was created. As such, the defendant contends, the disclosure statement properly identified a security interest in the real estate only.

But we conclude that the defendant's contention is without merit. The filing of a financing statement is relevant for priority purposes only. It does not deter-

mine the existence or non-existence of a security arrangement.

This self-evident principle is also echoed in *Bizier v. Globe Financial Services, Inc.,* 654 F.2d 1, 3 (1st Cir.1981); and *In re Perry,* 59 B.R. 947, 950–51 (Bankr.E.D.Pa. 1986).

The holding in *Bollinger, supra,* 614 F.2d at 926–28, that mere execution of a security document creates a perfected financing statement, significantly weakens and perhaps in itself establishes that the security interest taken by the mortgagee in the document in issue is not superfluous, and may be effective without recording. *See also* 13 Pa.C.S.A. § 9201. Of course, the Defendant could, at any time, assure perfection of the security interest by filing. *See* 13 Pa.C.S.A. § 9204(a). Thus, the language of the mortgage can veritably be said to create a security interest in the Debtor's appliances.

The Defendant cannot point to any authority in any jurisdiction to support its apparent argument that we can disregard its security interest in appliances in ascertaining whether its claim in issue here is within the scope of § 1322(b)(2). Collier rejects such reasoning in the following passage:

A claim secured by any other real property or by personal property of the estate or of the debtor, or by the property of another may be modified by the chapter 13 plan. Creditors sometimes demand real property and personal property to secure the same debt. *Even purchase money mortgages often take incidental security interest in appliances, furniture and other personalty.* Other creditors may have security interests in other real property, rents, escrow accounts, bank accounts, motor vehicles or insurance proceeds. All such claims may be modified by a chapter 13 plan, and a creditor may not protect its claim from modification by relinquishing its other liens after a bankruptcy is filed. A claim secured by a lien other than a security interest, on real estate that is the debtor's principal residence, may also be modified by a chapter 13 plan. 5 COLLIER

ON BANKRUPTCY, ¶ 1322.06[a], at 1322–13 to 1322–14 (footnotes omitted) (emphasis added) (15th ed. 1987).

The mortgages in issue in the New Jersey cases heavily relied upon by the Defendant are distinguishable on this ground. *Compare In re Hynson,* 66 B.R. 246, 248, 251–52 (Bankr.D.N.J.1986) (debtor stipulated that claim there was secured only by realty; court indicates acceptance of reasoning of *In re Simpkins,* 16 B.R. 956 (Bankr.E.D.Tenn.1982), which is distinguishable on this basis); and *In re Smith,* 63 B.R. 15 (Bankr.D.N.J.1986) (possibility that mortgage was not limited to real estate not considered). In addition to *Simpkins,* our conclusion and that of Collier is also supported by *In re Morphis,* 30 B.R. 589, 594 (Bankr.N.D.Ala.1983).

■ Assuming *arguendo* that the Defendant was able to convince us that its claim was within the scope of § 1322(b)(2), it would nevertheless fail in convincing us that its claim could not be bifurcated pursuant to § 506(a) on the basis of our reasoning explained at length in *Jablonski, supra;* and *Crompton, supra.* We acknowledged in *Crompton* that *Hynson* and *Smith* reach a different conclusion than we do on this point. However, we totally disagree with the following respective reasoning of those cases: (1) A broad interpretation of § 1322(b)(2) is needed to effectuate the purported congressional intent of protecting home mortgagees and preventing § 1322(b)(2) from being rendered meaningless. *Smith, supra,* 63 B.R. at 16–18; (2) Sections 506(a) and 1322(b)(2) are in conflict, and the more specific provisions of § 1322(b)(2) must be preferred over the more general provisions of § 506(a). *Hynson, supra,* at 249–50.

Rather, we believe that a far more thorough and convincing interpretation of Congressional intent in enacting § 1322(b)(2) than that presented in *Smith* is related in *In re Neal,* 10 B.R. 535, 538–40 (Bankr.S.D. Ohio 1981), wherein a narrow interpretation of § 1322(b)(2) is posited in the context of the Congressional intention "to make available the chapter 13 remedy to a wide range of financially distressed debtors, in-

cluding those debtors who may have one or more mortgages on their homes." *Id.* at 539. *Accord, In re Bruce,* 40 B.R. 884, 886–88 (Bankr.W.D.Va.1984).

Further, we believe that § 1322(b)(2) serves a purpose even if it is read, as we believe that the principles of statutory construction require, *see, e.g., Clark v. Uebersee Finanz-Korporation,* 332 U.S. 480, 488, 68 S.Ct. 174, 178, 92 L.Ed. 88 (1947); and *Commonwealth of Pennsylvania v. Department of Health & Human Services,* 723 F.2d 1114, 1119 (3d Cir.1983), not as in conflict with, but as *consistently* with, § 506(a) as possible. It prevents debtors from changing the payment terms of claims based on mortgages which actually are fully secured. This is not an inconsiderable impact, because *most* mortgages, particularly first, "purchase-money" mortgages, *are* fully secured due to the combined effect of payments by mortgagors and appreciation of housing values. By and large, it is only a small group of mortgagors, generally those who are financially distressed like the Debtor here, who are able to take advantage of § 506(a) vis-a-vis their home-purchase mortgagees.

We therefore believe that our reasoning, expressed at length in *Crompton* and *Jablonski,* that § 1322(b)(2) protects only those security interests which really exist rather than those of claims which are fully secured on paper only and, in actuality, are undersecured, was clearly correct. Nor are we alone. Our highly-respected predecessor, Judge Goldhaber, rendered several seminal decisions in this area which the New Jersey courts refuse, without adequate reason, to follow. *See, e.g., In re Panas,* 68 B.R. 421 (Bankr.E.D.Pa.1986); *In re Whitener,* 63 B.R. 701 (Bankr.E.D. Pa.1986); *In re Everett,* 48 B.R. 618 (Bankr.E.D.Pa.1985); *In re Spadel,* 28 B.R. 537 (Bankr.E.D.Pa.1983). *Cf. In re Bracken,* 35 B.R. 84 (Bankr.E.D.Pa.1983); and *In re Tanner,* 14 B.R. 933 (Bankr.W.D.Pa. 1981) (per COSETTI, CH. J.) (§ 506(a) applied in Chapter 7 cases).

Nor is the position of Judge Goldhaber on this point aberrational. It is supported not only by the decisions in *Neal, Bruce,*

*Simpkins,* and *Morphis,* cited *supra,* elsewhere, but expressly adopted in the following quotation from Collier:

> since this section [1322(b)(2)] only applies to modification of the rights of holders of claims by the chapter 13 plan, it does not affect the determination of the allowed secured claim through the operation of section 506. Hence an undersecured claim secured only by a security interest in the debtor's principal residence may still be divided into an allowed secured and an allowed unsecured claim, with the lien declared void to the extent it secures a claim in excess of the allowed secured claim. 5 COLLIER ON BANKRUPTCY, *supra,* ¶ 1322.06[a], at 1322–14.1 to 1322–15 (footnotes omitted).

We therefore totally reject the Defendant's efforts to urge us to rethink our holdings in *Crompton* and *Jablonski.* We note that we have consistently applied § 506(a) as the Debtor requests that we do here in numerous other cases, some involving this same defendant, where the propriety of our doing so was uncontested. *See In re Blakey, Blakey v. Pierce, Secretary of HUD,* 76 B.R. 465 (Bankr.E.D.Pa., 1987); *In re Lopez, Lopez v. Beneficial Mutual Savings Bank,* 75 B.R. 961 (Bankr.E.D.Pa., 1987); *In re Miller, Miller v. HUD,* Bankr. No. 86–04708S, Adv. No. 87–0424S (Bankr.E.D.Pa., 1987). *Cf. In re Kessler, Kessler v. Merrill Lynch Mortgage Corp.,* 76 B.R. 434 (Bankr.E.D.Pa., 1987) (Chapter 7 case).

■ Having disposed of the issue to which the parties devoted most of their attention, we shall discuss several other issues briefly. First, we cannot grant any further reduction in the Defendant's secured claim on the basis of alleged TILA violations for two reasons. The first is the presence of 15 U.S.C. § 1612(b), which provides as follows:

> (b) No civil or criminal penalty provided under this subchapter for any violation thereof may be imposed upon the United States or any department or agency thereof, or upon any State or political subdivision thereof, or any agency of any State or political subdivision.

The United States itself, as well as his HUD, come within the definition of "the United States or any department or agency thereof, ..." *Compare Federal Deposit Ins. Corp. v. Webb,* 464 F.Supp. 520, 525 (E.D.Tenn.1978) (FDIC is exempt from liability under § 1612(b)); *with Werts v. Federal National Mortgage Ass'n,* 48 B.R. 980, 983 (E.D.Pa.1985) (FNMA not exempt because it is only a "government-sponsored private corporation").

Secondly, we do not find that the Debtor met her burden of proving that a TILA violation existed. Having not produced any TILA disclosure statement, the Debtor's claim was reduced to convincing us of the unlikely possibility that she received no disclosure statement whatsoever. While we do not doubt that there are situations where the uncorroborated testimony of a consumer that documents required to be presented to the consumer under the TILA were not in fact received could be sufficient to convince us on this point, *cf. In re Underwood,* 66 B.R. 656, 661–62 (Bankr.W.D.Va.1986), the testimony of this particular Debtor fails to do so. *See In re Johnson-Allen,* 67 B.R. 968, 970 (Bankr.E.D.Pa. 1986). We agree with the Defendant's observation that there is no evidence to support the Debtor's insinuations that the Defendant had a duty to produce a copy of the TILA disclosure statement at trial to rebut the claims of potential TILA violations and that it intentionally refused to supply a statement containing known TILA violations to escape liability. Had the Debtor so much as unsuccessfully attempted to obtain the disclosure statement through discovery from the Defendant and the original mortgagee, and these parties were unable to produce it, as in *Johnson-Allen, supra,* our conclusion may have been different. Here, however, our result would be reliant upon the memory of the Debtor, which we expressly held failed to inspire confidence. Hence, we reject the Debtor's attempt to further reduce the Defendant's claim by means of a TILA recoupment claim.

In contrast to *Blakey, supra,* the parties have devoted relatively little argument to the issue of determination of value, proba-

bly because the difference in the figures recited by the "dueling appraisers" is less than in *Blakey.* We do observe that both of the appraisers here gave better accounts of themselves than either of the appraisers in *Blakey.* Both appeared to have been quite thorough. Their differences arose from factoring in the impact of the poor condition of the premises.

One important distinction between this case and *Blakey* is the relative severity of the defects in the premises there. Both the heater and the hot water heater in the Blakey residence had been dysfunctional for an extended period of time. All major systems of the home here were, by contrast, operable. It should also be noted that the immediate neighborhood in which the home of the instant Debtor is located is somewhat better than that where the Blakey residence was situated (1057 South 50th Street, Philadelphia, Pennsylvania 19143). If the Blakey home was worth $12,000.00, then this home logically should be worth a little more.

However, as in *Miller, supra,* we are forced to observe that the Defendant's expert is its own employee. We do not doubt that United States is a large employer, as the Defendant points out, and that Mr. Meyers had little or no contact with this case other than making the appraisal. However, we believe that the factor of loyalty to HUD, his employer for twenty-five years, obviously influenced him, at least subconsciously, in his decision-making process. Although Mr. Meyers was considerably more impressive than Sheila Rodriguez, HUD's expert witness in *Miller,* and did make a thorough inspection of the premises, we found his approach, like that of Ms. Rodriguez, too closely wedded to comparable sales, rather than considering the impact on value of the real defects in the home of the Debtor. Also, we must observe that Mr. Silver had considerably more experience with the local housing market than Mr. Meyers. While we found Mr. Silver's appraisal less impressive than that of Mr. Meyers, Mr. Silver also presented relatively good oral account of his conclusions (as opposed to a poor written product), and convinced us that Mr. Meyers'

figure must be tempered. On the basis of the foregoing factors, we concluded that the fair market value of the home was $13,000.00.

We note one final point. In offhand fashion, the Debtor states, in her Brief, that she has recently amended her Chapter 13 Statement to add a pre-petition City water and sewer bill, the amount of which and the lien status of which she "does not know," but asks that we deduct this sum, whatever it may be, from the Defendant's secured claim. We cannot do so for two reasons. First and foremost, nothing concerning the City's claims is in this record. Secondly, at least after the *Blakey* case, *see supra,* at 472–73, we confess to having some uncertainty as to the relative priority of a mortgage lien and City liens. Therefore, in framing our Order, we can only work with the Defendant's claim, apart from any possible claims against the Debtor by the City.

We shall therefore proceed to enter the following Order, the aspects of which are derived from our conclusion that the value of the Defendant's secured interest in the interest of the Debtor's estate in the home is $13,000.00, thus justifying bifurcating the Defendant's claim into a secured claim for $13,000.00 and an unsecured claim of $6,559.34.